STEVEN MICHAEL HOMICK, APPELLANT, v. THE STATE OF NEVADA, Respondent.

No. 26572

April 3, 1996                                    913 P.2d 1280

*David M. Schieck,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

On December 11, 1985, Bobbie Jean Tipton, her maid and a deliveryman were murdered at the Tipton house. Each of the victims died from gunshot wounds to the head or chest. Additionally, the Tiptons' floor safe, containing numerous pieces of unique and expensive jewelry, was ransacked and the jewelry stolen.

A couple of days after the murders, appellant Steven Michael Homick became a suspect. He was indicted for the murders in May of 1986 and convicted and sentenced for commission of the murders in May of 1989. His indictment and convictions stemmed from, first, evidence of Homick's possession of a substantial amount of the stolen Tipton jewels. Additionally, Timothy Catt, who worked with Homick at the Tower of Jewels in Las Vegas, testified that Homick confessed to him that he had committed the murders.

After his conviction, Homick filed a direct appeal. This court affirmed his conviction. Homick then filed a post-conviction petition for a writ of habeas corpus with the district court. The district court denied his petition. Homick appealed the denial of his petition to this court. We now affirm the district court's denial of Homick's petition, concluding that Homick's assertions of error lack merit.

### FACTS

On May 21, 1989, Homick was convicted of three counts of first degree murder with use of a deadly weapon, robbery with use of a deadly weapon, and burglary. The convictions stemmed from the deaths of Bobbie Jean Tipton, her maid, Marie Bullock, and a deliveryman, James Meyers. Homick was sentenced to death. On direct appeal, his convictions and sentence were affirmed in Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992).

David Tipton, Bobbie Jean's husband, returned home from his real estate office at approximately 1:30 p.m. on December 11, 1985. He had been unable to reach his wife between 11:00 a.m. and 12:00 p.m. to confirm lunch plans. When he arrived at his residence, he observed a Michael's Gourmet Steaks and Seafood delivery truck with the engine running. When he entered the house, he discovered the body of Meyers near the door to the

master bedroom. Tipton immediately called the police. While talking to them, he discovered the bodies of his wife and the maid lying on the floor in the master bedroom closet. The bedroom had been ransacked. A floor safe in the closet had been opened. Empty jewelry boxes were strewn about the floor of the closet and the bedroom. Autopsies revealed that all three victims died as a result of gunshot wounds. All the wounds on the women were consistent with those made by .22 caliber bullets, as were two of the three wounds on Meyers. A firearms expert determined that all the .22 caliber bullets had come from the same weapon.

At trial, substantial evidence was presented regarding the time of the murders and Homick's movements during that time frame. Patricia Ann Lundy, the personal secretary to Bobbie Jean Tipton, called the Tipton residence at 10:30 a.m. the day of the murders. Bobbie Jean Tipton answered the phone and insisted that Lundy not come by the Tipton house that morning. At approximately the same time, Michael Carder, a United Parcel Service deliveryman, arrived at the Tipton residence to deliver three packages. When no one answered the door, he left the packages near the door. As Carder pulled away, he saw Mrs. Tipton, dressed in a white robe, open the door and pick up the packages. He also specifically recalled seeing a Toyota four wheel drive pickup truck with a camper shell and brush guard in the driveway. He recalled that the truck was not idling.

At approximately 10:20 a.m., James Meyers, a deliveryman for Michael's Gourmet Steaks and Seafood was en route to the Tipton residence. Although his delivery truck was also a white Toyota, it did not have a camper shell or brush guards on it. It did, however, have signs for the company on its sides. At approximately five or ten minutes before noon, Joseph Forgue of Las Vegas Pest Control serviced the Tipton residence. He saw two vehicles in the driveway, Marie Bullock's Ford Mustang, and a white Toyota pickup with the motor running. Bullock had apparently arrived at the Tipton residence shortly before 11:00 a.m. the day of the murders. Forgue was at the Tipton residence for about ten minutes, and did not notice anything unusual except for the idling white truck.

On the morning of the murder, at approximately 9:45 a.m., Homick drove Susan Hines and Lawrence Ettinger to the office of attorney Stewart Bell. Hines and Ettinger met with Bell for approximately thirty to forty minutes and then called Homick on his beeper. Homick arrived at Bell's office approximately five minutes later. Homick then dropped Hines and Ettinger off at Ettinger's residence and left.

Michael Dominguez, a longtime friend of Homick's, testified that in July of 1985, Homick asked him to kill Craig Meraldo

because Meraldo owed Homick money. Dominguez's murder of Meraldo would settle a drug debt between Dominguez and Homick. Dominguez borrowed a .22 caliber Ruger gun with a silencer to kill Meraldo. Although Dominguez did not actually kill Meraldo, he did discharge approximately seven shots into the Meraldo residence. Dominguez returned the gun to Homick the next day. It was determined by a firearms expert that the expended cases found outside the Meraldo residence matched the eight .22 caliber cases removed from the Tipton residence. Additionally, Dominguez testified that sometime during the afternoon of the day of the murders he met Homick at Ettinger's house and saw on the floor of Homick's station wagon the same .22 caliber Ruger he had used to try to kill Meraldo.

Timothy Catt, who worked with Homick, testified that in late January of 1986, Homick told him that he had committed the murders and gave Catt details of the murders. Both worked at the Tower of Jewels where Mrs. Tipton had her jewelry cleaned and appraised. In January of 1986, before Homick confessed his involvement in the murders, Homick also showed Catt numerous pieces of jewelry that Catt recognized as Mrs. Tipton's.

Other evidence was also presented at trial that linked Homick to the jewelry stolen from the Tipton household. This included testimony regarding several instances in which Homick was in possession of the Tipton jewelry and seeking to have it appraised or to have identifying numbers ground off the jewelry. Conversations recorded via wiretaps placed on Homick's phone in January of 1986 also revealed that Homick and his family knew about the stolen jewelry and that they were actively trying to cover it up.

Homick was indicted for the Tipton murders in May of 1986. At the time of his indictment, Homick was in custody in California for two unrelated murders, the Woodman murders. On May 21, 1989, Homick was convicted of three counts of first degree murder with use of a deadly weapon, robbery with use of a deadly weapon, and burglary, and sentenced to death.

On May 14, 1993, Homick filed a post-conviction petition for a writ of habeas corpus with the district court. On November 14, 1993, following an evidentiary hearing, the district court denied Homick's petition.

## DISCUSSION

*Homick's counsel was not ineffective in preparing for trial and obtaining and presenting necessary evidence at trial.*

Homick argues that he was denied effective assistance of counsel during his trial. He cites four specific instances where his counsel was allegedly so ineffective as to warrant his conviction

being vacated. The four specific errors Homick cites are: (1) failure to call Raymond Jackson as a witness; (2) failure to develop the Dominguez-Danielson connection as a theory for the defense; (3) failure to interview or call to trial any of Dominguez's associates for information regarding Dominguez's connection to the Tipton murders; and (4) failure to impeach Timothy Catt. At the evidentiary hearing, Homick's attorneys testified that the alleged mistakes in Homick's defense were prejudicial, warranting an overturning of Homick's conviction.

Strickland v. Washington, 466 U.S. 668, 687 (1984), and its local progeny govern ineffective assistance of counsel claims. In order to obtain relief on a claim for ineffective assistance of counsel, the petitioner must be able to satisfy two tests. First, "appellant must demonstrate that his trial counsel's representation fell below an objective standard of reasonableness." Davis v. State, 107 Nev. 600, 601, 817 P.2d 1169, 1170 (1991). Second, "appellant must show that counsel's deficient performance prejudiced the defense to such a degree that, but for counsel's ineffectiveness, the results of the trial would probably have been different." Id. at 601-02, 817 P.2d at 1170. Counsel's performance is measured by an objective standard of reasonableness which takes into consideration prevailing professional norms and the totality of the circumstances. Strickland, 466 U.S. at 688.

Trial counsel must make rational and informed decisions on strategy and tactics based on adequate investigation and preparation. People v. Ledesma, 729 P.2d 839, 857 (Cal. 1987). However, in examining a counsel's defense after it has proved unsuccessful, it is easy for a court to conclude that certain acts or omissions by counsel were unreasonable. Strickland, 466 U.S. at 689. Therefore, there is a presumption that trial counsel was effective and "fully discharged" his duties. Davis, 107 Nev. at 602, 817 P.2d at 1170. This presumption can only be overcome by "'strong and convincing proof to the contrary.'" Id. (quoting Lenz v. State, 97 Nev. 65, 66, 624 P.2d 15, 16 (1981)).

The Court in Strickland concluded that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. 466 U.S. at 691. Therefore, the Court stated: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Id. at 697.

1. *Failure to Call Raymond Jackson.*

Homick complains that his attorney's failure to locate or call Raymond Jackson to testify prejudiced his defense. Homick claims that Jackson would have been instrumental in proving that he was elsewhere at the time the murders were committed. Jackson testified at the penalty phase of the Woodman case in California that he observed a small white pickup truck in the Tipton driveway on the day of the murders between 9:30 a.m. and 10:30 a.m.

Homick's theory of his defense was that the person in the white Toyota pickup truck with the camper shell, who was never accounted for, was the actual murderer. Thus, if Jackson had testified, Homick claims it would have put the alleged murderer at the Tipton household even earlier than when Carder, the UPS delivery man, had seen the white Toyota truck. Carder had seen the truck at 10:30 a.m., a time at which Homick was possibly still with Ettinger and Hines after their meeting with Stewart Bell.

However, Homick's theory regarding the connection of the white pickup truck to the murders was presented at trial. The jury had an opportunity to evaluate the theory of whether the driver of the white pickup with the camper shell was involved in the murders. We conclude that based on the verdict, the jury rejected this theory, and counsel's failure to locate or call Raymond Jackson to the witness stand did not prejudice Homick's defense. Therefore, we need not reach the question of whether Homick's counsel was ineffective in failing to do so.

2. *Failure to Fully Explore the Dominguez/Danielson Connection.*

Homick also presented at trial his theory that Michael Dominguez and an associate, Kelly Danielson, committed the Tipton murders. Homick contends his attorneys were ineffective because they produced limited information regarding Dominguez's and Danielson's connections to the Tipton murders. Although Danielson was unable to testify at the trial in this case (Danielson had at this point been murdered by Dominguez), Dominguez testified and was cross-examined by Homick's counsel.

The defense questioned Dominguez about a variety of crimes he committed with both Danielson and Homick in an attempt to impeach his incriminating testimony against Homick. Homick's attorney also brought out on cross-examination the fact that

Dominguez had made a deal with the State regarding his sentencing on other crimes he had committed, provided that Dominguez was not involved in the Tipton murders.

Additionally, testimony was presented that Dominguez's connection to the murder would probably have been found on the transcripts of his conversations recorded on a wiretap placed on his phone. The wiretap was in place on Dominguez's phone between January 29 and March 14, 1986. However, nothing in the wiretaps linked Dominguez to the Tipton jewels or the Tipton murders.

Homick also claims that at the California trial, which occurred after the Nevada trial, James Hampton testified he saw a man matching Danielson's description walking through the desert near the Tiptons' house. However, according to the record, Hampton came forward and told his attorney about what he had seen only after the trial in this case. Homick claims that "[i]f more substantial evidence had been made to develop and present the theory [of Dominguez's and Danielson's involvement] the result at trial may well have been different." Homick is encouraging this court to view his counsel's actions regarding Dominguez and Danielson through hindsight. Under Strickland v. Washington, 466 U.S. 668, 690 (1984), "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Based on this, we conclude the actions taken by Homick's attorney to impeach Dominguez were reasonable. Additionally, one of Homick's attorneys admitted at the evidentiary hearing that the theory behind the Dominguez/Danielson connection was merely a gut feeling. Therefore, we are not shown what additional evidence would have been developed if further investigation into the Dominguez/Danielson connection had been conducted or how it would have changed the trial result.

### 3. Failure to Interview Dominguez's Associates.

Homick also claims that his counsel was ineffective for failing to interview or call at trial any of Dominguez's "associates." Homick states Dominguez admitted to at least one of his associates, Michael Harris, that he and Danielson were responsible for the Tipton murders. Again, this evidence did not surface until approximately December of 1990, well after the trial in this case was over. This was information Homick's defense team could not have known about at the time of the trial in this case because Harris had not yet contacted them.

Harris was an adjudged habitual criminal in California who testified he did not like Dominguez because he thought Dominguez was a snitch. Harris and Dominguez had been housed together at the Southern Nevada Correctional Center. Harris claimed that while reading an account of the Homick proceedings, Dominguez told him Homick had not committed the murders. Dominguez allegedly told Harris he and Kelly Danielson were responsible for the murders. However, Dominguez did not provide Harris with any details of the murders.

This is another instance of Homick's complaining about his attorneys' actions with hindsight. Additionally, Homick has not shown that without his attorneys' failure to discover and present Harris's testimony there is a reasonable probability the result of his trial would have been different. Therefore, we conclude this failure on the part of Homick's attorneys does not constitute ineffective assistance of counsel.

### 4. *Failure to Properly Impeach Timothy Catt.*

Finally, Homick argues his attorneys were ineffective because they failed to call witnesses to impeach Timothy Catt on certain aspects of his incriminating testimony. Catt testified that in late January of 1986, Homick asked Catt to meet him on Commercial Center by the Town Pump Liquors. Homick and Catt actually met in Catt's car because, as Catt testified, Homick would not have been able to talk to him at the Tower of Jewels. This was, according to Catt, because Homick and Jack Weinstein, his boss, had a falling out. It was at this meeting, Catt testified, that Homick confessed his involvement in the murders to him.

Homick claims two witnesses, Jack Weinstein and Billy Mau, were available to testify and testified in California that there would have been no reason for Homick to have met with Catt in his car because until his arrest, Homick continued to work at the Tower of Jewels for Jack Weinstein. Therefore, Homick claims, witnesses should have been called to testify that there was no falling out between Weinstein and Homick.

At the evidentiary hearing, Homick's trial attorney, William Smith, testified and indicated that both he and the investigator spoke to Weinstein and Mau. Smith indicated that although he talked to Weinstein and cross-examined Mau at trial, the issue of a falling out between Weinstein and Homick was never addressed. The record, however, does not indicate that either of these two witnesses could have proved that the meeting between Homick and Catt had not actually occurred.

Additionally, Homick again fails to show that impeaching Catt on this collateral issue would have resulted in a reasonable probability that his conviction would have been overturned.

Therefore, we conclude this alleged error does not justify a determination that Homick's counsel was ineffective.

*The State did not violate Homick's due process rights by failing to provide Brady material from a joint federal/state investigation.*

"It is a violation of due process for the prosecutor to withhold exculpatory evidence, and his motive for doing so is immaterial. Brady v. Maryland, 373 U.S. 83 (1963)." Wallace v. State, 88 Nev. 549, 551-52, 501 P.2d 1036, 1037 (1972). "A prosecutor must disclose evidence favorable to an accused when that evidence is material either to guilt or to punishment." Roberts v. State, 110 Nev. 1121, 1127, 881 P.2d 1, 5 (1994). In determining whether material should be considered *Brady* material, the court should look at the following elements: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." Moore v. Illinois, 408 U.S. 786, 794-95 (1972). A *Brady* violation occurring after a specific request is material if "there exists a reasonable *possibility* that the claimed evidence would have affected the judgment of the trier of fact, and thus the outcome of the trial." *Roberts*, 110 Nev. at 1132, 881 P.2d at 8 (emphasis added). This "reflects the 'concern that the suppressed evidence *might have affected the outcome of the trial.'*" *Id.* (emphasis added) (quoting *Agurs, 427 U.S. at 104).

On December 13, 1985, Las Vegas Metropolitan Police Department (LVMPD) Detectives Thomas Dillard and Bob Leonard, who were in charge of investigating the Tipton murders, met with FBI representatives. Homick became a suspect in the Tipton murders as a result of this meeting. Because of a prior FBI investigation, Homick's residential phone had been fitted with a pen register, a device which monitors phone activity without actually recording conversations. Additionally, as of December 11, 1985, at approximately 2:20 p.m., Homick had been placed under FBI surveillance.

In March of 1989, Homick was indicted by a federal grand jury on charges of racketeering, interstate transportation of stolen property, conspiracy to distribute and possession of a controlled substance, wire fraud, arson, and murder for hire. The Tipton murders were listed in the federal indictments as a predicate act to the federal charges. Therefore, Homick claims, the federal and state cases were intertwined. Homick argues that because the two cases were intertwined, the federal investigation should be considered as an arm of the state prosecution. However, the record does not indicate that this was a joint investigation.

Specifically, Homick requested production of the handwritten notes made by FBI Special Agent James Livingston regarding a phone call between Livingston and Art Taylor. This request was made to the state prosecutor in February, 1989 prior to Homick's state court trial. Art Taylor, who owned a C-B shop, was at this time acting as an FBI informant. The conversation between Taylor and Livingston took place at approximately 12:30 p.m. on the day of the murders. In this conversation, Taylor indicated that Homick had been with him at his place of business earlier in the morning.

Homick's defense was that he could not have been at the Tipton residence at the time the murders were committed, which his defense assumes occurred when the white Toyota truck was present. Therefore, the defense wanted these notes to provide a firmer timetable of Homick's movements the morning of the murders and to determine whether Homick had been under full FBI surveillance that morning. Testimony was presented by several witnesses that the meeting between Susan Hines, Lawrence Ettinger, and Stewart Bell ended at some point between 10:15 a.m. and 10:45 a.m. Hines and Ettinger then paged Homick on his beeper, and Hines testified Homick arrived at Bell's office between 10:15 a.m. and 10:30 a.m. Testimony indicated, however, that Homick was meeting with Taylor at the same time Ettinger and Hines were meeting with Bell and that Homick left Bell's at approximately 10:30 a.m.

Under the requirements of *Roberts*, Homick has not shown that the notes regarding the Taylor/Livingston conversation would reasonably have affected the outcome of the trial. Testimony was given regarding Homick's movements the morning of the murders. Any evidence regarding the meeting between Taylor and Homick simply supports the State's time frame presented at the trial. Therefore, we conclude these notes were not material and that failure to provide them did not constitute a *Brady* violation. Additionally, the record indicates to this court that LVMPD provided Homick with all the evidence it had prior to trial, and that it was not in possession of the notes made by FBI agent Livingston.

Homick also requested the FBI notes based on the "surrounding circumstances" of the surveillance, i.e., that if Homick was under surveillance the morning of the murders, the FBI would be able to provide specific information regarding his movements. However, evidence was presented that Homick was not actually

under surveillance until approximately 2:20 p.m. the afternoon of the murders. Therefore, we conclude the FBI notes were not material and would not have provided Homick with any exculpatory evidence. Thus, we conclude no *Brady* violation was committed.

*The cumulative effect of errors during trial does not mandate reversal.*

Finally, Homick argues that cumulative errors committed in the trial warrant a reversal of his conviction. These alleged errors include the failure to call Raymond Jackson, the failure of the FBI to turn over Agent Livingston's notes, the newly discovered evidence provided by James Hampton and Michael Harris, and the complications Homick was facing by being involved in three prosecutions simultaneously.

If the cumulative effect of errors committed at trial denies the appellant his right to a fair trial, this court will reverse the conviction. Big Pond v. State, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985). Relevant factors to consider in deciding whether error is harmless or prejudicial include whether "the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Id.*

This court must determine that any errors are harmless beyond a reasonable doubt. Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988). Evidence against the defendant must be substantial enough to convict him in an otherwise fair trial, and it must be said without reservation that the verdict would have been the same in the absence of error. *Id.* at 724, 765 P.2d at 1156.

We conclude that the errors alleged by Homick are not serious errors or not errors at all. In their absence substantial evidence existed to convict Homick, and the verdict would have been the same.

## CONCLUSION

We conclude that even if some of the actions of Homick's counsel were deemed to be ineffective under the Sixth Amendment, Homick has not shown by strong and convincing evidence that but for his counsel's deficient performance, the results of his trial would have been different. Additionally, we conclude no *Brady* violation was committed in regard to the failure of the FBI to turn over the notes from the Livingston/Taylor conversation. Finally, we conclude Homick was not denied a fair trial on the

basis of cumulative error. Accordingly, we affirm the district court's order denying Homick's post-conviction petition for a writ of habeas corpus.