OPINION
 

 By the Court,
 

 Maupin, J.:
 

 In this case, we primarily consider whether the State’s peremptory challenge of a prospective juror on the ground that he did not understand the English language violates the rule set forth in the United States Supreme Court decision in
 
 Batson v.
 
 Kentucky.
 
 [1]
 

 A jury convicted appellant Jose Diomampo of mid-level trafficking in a controlled substance in violation of Nevada’s Uniform Controlled Substances Act.
 
 [2]
 
 On appeal, he argues that the State used its peremptory challenges in a discriminatory manner in violation of
 
 Batson.
 
 He also argues that the State commented on his post-Miranda
 
 [3]
 
 silence at trial in violation of the Fifth Amendment, that the district court improperly admitted evidence of prior bad acts in violation of NRS 48.045(2), that police conducted an unreasonable vehicle inventory search in violation of his Fourth Amendment rights, and that the State presented insufficient evidence to sustain his conviction on appeal.
 

 We conclude that the State violated
 
 Batson
 
 in exercising two of its peremptory challenges, that the State’s witnesses improperly commented on Diomampo’s
 
 post-Miranda
 
 silence at trial, and that the State improperly introduced evidence prejudicially suggesting that methamphetamine users generally resort to burglary to support their addictive behavior. Further, although the State also introduced prior bad act evidence without a requisite hearing under
 
 Petrocelli
 
 
 *419
 
 v.
 
 State
 

 [4]
 

 and failed to provide a contemporaneous explanatory instruction of that evidence in compliance with our decision in
 
 Tavares v. State,
 

 [5]
 

 those procedural errors were not preserved for argument on appeal and do not ascend to plain error. We further conclude that the police conducted a proper vehicle inventory and that the State provided sufficient evidence upon which to convict. Nonetheless, the errors identified above compel reversal of Diomampo’s conviction and a remand of this matter for a new trial.
 

 FACTS AND PROCEDURAL HISTORY
 

 At approximately 2 a.m. on May 19, 2004, Las Vegas Metropolitan Police Department (LVMPD) officers Paul Wojcik and Frank Gabron effected a routine traffic stop of an automobile driven by Diomampo. The officers noted that Diomampo and his passenger, Bernadette Olsen, made “furtive movements” while slowing down and that Diomampo continued to drive approximately 500-600 feet before bringing the vehicle to a stop. Officer Wojcik approached the driver’s side of the vehicle and requested that Diomampo provide identification.
 

 Diomampo was only able to produce a photocopy of his driver’s license. The officers also determined that Olsen was in possession of a Nevada identification card but no driver’s license. A check of Diomampo’s record revealed outstanding warrants for his arrest, that his driver’s license was suspended, and that he was not the registered owner of the vehicle. Accordingly, Officer Wojcik placed Diomampo under arrest. Officer Wojcik noted that Diomampo appeared to be “somewhat disorientated and sweating profusely,” and he had difficulty articulating responses to routine inquiries. The officers made no attempt to contact the vehicle’s registered owner.
 

 Officer Gabron thereafter performed a search of Diomampo’s fanny pack, which revealed an electronic scale that contained a “white, crystalline-type substance.” The officers then placed Diomampo in their patrol car, impounded the vehicle and commenced an inventory search of the vehicle.
 
 [6]
 
 The search revealed a black sunglass case, located under the floormat of the front passenger side of the vehicle, containing six plastic bags of a white, crystal-like substance, later determined to be methamphetamine. Officer Wojcik then read Diomampo his
 
 Miranda
 
 rights, in re
 
 *420
 
 sponse to which Diomampo invoked his Fifth Amendment right to remain silent.
 

 The inventory search also revealed a razor blade in the passenger seat and a partially damaged glass pipe between the driver’s seat and the center console.
 
 [7]
 
 Officer Wojcik labeled the sunglass case as “[njarcotics kit with razor and broken smoking pipe” in his impound report, along with a cell phone charger, a car stereo, an “amp,” speakers, three floor mats, a pair of pants, a social security card, a gift card, and two other plastic cards.
 

 The State initially charged Diomampo with high-level felony trafficking in a controlled substance and a justice of the peace bound him over for trial on that charge in the district court. Based upon a reweighing of the methamphetamine, the State filed an amended information charging Diomampo with mid-level trafficking. The district court later denied a motion to suppress the contraband recovered from the vehicle and the matter proceeded to trial.
 

 During the State’s case in chief, Officer Wojcik testified that Diomampo remained silent after being read his
 
 Miranda
 
 rights:
 

 A: ... I read both Olsen and Mr. Diomampo their
 
 Miranda
 
 rights with my department-issued
 
 Miranda
 
 rights card for the purpose of being able to ask them direct questions pertaining to the substance that I had found inside the vehicle.
 

 Q: . . . . Did Mr. Diomampo indicate that he understood his rights?
 

 A: Yes.
 

 Q: Did he say anything to you at that point in time?
 

 A: He did not say anything to me.
 

 Q: Okay.
 

 MS. NGUYEN: Objection .... I think it’s improper to comment on his right to remain silent.
 

 The court overruled the objection. Later during trial, Officer Gabron stated that, “[o]nce [Diomampo] found out that he was under arrest . . . and
 
 Miranda
 
 was read to him[,] ... he refused to speak to police any further.” As to this comment, the district court determined that the appropriate remedy was to move on and not return to the topic.
 

 In addition, Officer Wojcik testified at trial that he had training and experience with narcotics offenders and that, ‘ ‘with methamphetamine[,] normally in order for somebody to support their habit[,] they’ll go out and commit robberies or burglaries.”
 

 
 *421
 
 The jury convicted Diomampo of mid-level trafficking in a controlled substance and the district court imposed a sentence of 24-60 months in the Nevada Department of Corrections. Diomampo appeals from the judgment entered upon the jury verdict.
 

 DISCUSSION
 

 On appeal, Diomampo contends that the State used its peremptory challenges in a discriminatory manner, that the State improperly commented on his
 
 post-Miranda
 
 silence, that the district court improperly admitted evidence of prior bad acts, that police conducted an unconstitutional inventory search of his vehicle in violation of the Fourth Amendment, and that the State presented insufficient evidence to sustain his conviction on appeal. We will address each argument in turn.
 

 Batson challenge
 

 During jury selection, the State used all four of its peremptory challenges to dismiss prospective jurors Ramirez, Nelson, Benitez, and Elliott, all members of recognized ethnic minorities.
 
 [8]
 
 The district court denied Diomampo’s
 
 Batson
 
 objections to these peremptory challenges.
 

 Diomampo contends under
 
 Batson
 
 that the State, in using all of its peremptory challenges to excuse minority jurors, violated his constitutional rights to a fair trial and impartial jury and that potential jurors have a constitutionally protected right to sit on a jury.
 
 [9]
 
 In this, Diomampo argues that the State’s race-neutral reasons for its peremptory challenges were insufficient as to all four minority jurors, that a pattern of discrimination is not necessary to prove discrimination, and that striking a single juror for a discriminatory purpose warrants reversal.
 
 [10]
 
 We conclude that Diomampo’s
 
 Batson
 
 challenge as to two potential jurors has merit.
 

 
 *422
 
 In
 
 Batson v. Kentucky,
 

 [11]
 

 the United States Supreme Court held that the use of peremptory challenges to remove potential jurors on the basis of race is unconstitutional under the Equal Protection Clause of the United States Constitution.
 
 [12]
 
 The Court has outlined the following three-pronged test for determining whether illegal discrimination has occurred: (1) the defendant must make a prima facie showing that discrimination based on race has occurred based upon the totality of the circumstances, (2) the prosecution then must provide a race-neutral explanation for its peremptory challenge or challenges, and (3) the district court must determine whether the defendant in fact demonstrated purposeful discrimination.
 
 [13]
 

 In
 
 Purkett v. Elem,
 
 the United States Supreme Court further explained that “[t]he second step of this process does not demand an explanation that is persuasive, or even plausible.”
 
 [14]
 
 The race-neutral explanation “is not a reason that makes sense, but a reason that does not deny equal protection.”
 
 [15]
 
 In addition, we stated in
 
 Ford v.
 
 State
 
 [16]
 
 that “[wjhere a discriminatory intent is not inherent in the State’s explanation, the reason offered should be deemed neutral.”
 
 [17]
 
 However, “[a]n implausible or fantastic justification by the State may, and probably will, be found [under the third prong of Batson] to be pretext for intentional discrimination.”
 
 [18]
 

 In reviewing a
 
 Batson
 
 challenge, “ ‘[t]he trial court’s decision on the ultimate question of discriminatory intent represents a finding
 
 *423
 
 of fact of the sort accorded great deference on appeal.’ ”
 
 [19]
 
 Discriminatory jury selection in violation of
 
 Batson
 
 generally constitutes “structural” error that mandates reversal.
 
 [20]
 
 We now turn to the individual challenges with which Diomampo takes issue.
 

 A.
 
 Prospective juror Ramirez
 

 The State advanced the following purported race-neutral justification for its challenge of prospective juror Ramirez:
 

 Ramirez ... I think that there was ... a language barrier there . . . and that has nothing to do with his descent, it has to do with his understanding of the English language ....
 

 Diomampo contends that the State improperly challenged Ramirez based upon his apparent inability to understand English. In this, he argues that this justification fails as a valid, race-neutral justification for a peremptory challenge because there is no indication in the record that Ramirez failed to understand the questions put to him and he appropriately answered all of the inquiries. In addition, he contends that dismissing Ramirez because of his purported inability to speak and understand English constituted de facto discrimination, on the basis of race and ethnicity, against the Spanish-speaking population of Clark County. Diomampo also claims that if there was any problem with Ramirez, it was that he did not speak loudly enough and the court reporter, by asking him to speak louder, corrected the problem. He further notes that neither the district court judge nor the attorneys questioned Ramirez about his ability to understand English.
 

 We conclude that the State exercised its peremptory challenges in a discriminatory manner by excusing Ramirez. The pertinent portion of the voir dire examination is as follows:
 

 POTENTIAL JUROR RAMIREZ: Thank you. Hi. My name is . . . Ramirez. I live in Northwest Las Vegas and I come from [unintelligible]. I live and been working for 14 years ago. My company’s work is bridge on the freeways, bridge that goes—
 

 
 *424
 
 THE COURT: .... What kind of work do you do for them?
 

 POTENTIAL JUROR RAMIREZ: Excuse me?
 

 THE COURT: What kind of work do you do for them?
 

 POTENTIAL JUROR RAMIREZ: Oh—
 

 THE COURT: Construction?
 

 POTENTIAL JUROR RAMIREZ: -I am a finisher [unintelligible].
 

 THE COURT: I’m sorry?
 

 POTENTIAL JUROR RAMIREZ: I’m a finisher [unintelligible].
 

 THE COURT: Okay.
 

 COURT RECORDER: You need to speak up.
 

 THE COURT: .... And do you have a wife or significant other who works?
 

 POTENTIAL JUROR RAMIREZ: Yeah. My wife lives in Mexico.
 

 THE COURT: Okay.
 

 POTENTIAL JUROR RAMIREZ: She’s coming pretty soon.
 

 THE COURT: Okay. Any kids that work?
 

 POTENTIAL JUROR RAMIREZ: No. Don’t work.
 

 THE COURT: All right. If you would hand [the microphone] to Ms. Ainsworth.
 

 The record indicates that Ramirez answered each of the questions that he was asked at the jury venire; the only defect in Ramirez’s communication was that he did not speak loudly enough. The record reflects an exchange between the court reporter and Ramirez that indicates a request by the reporter that Ramirez “speak up.” We agree with Diomampo that this request appeared to cure any communication issues that might have come up during trial. In addition, neither the prosecution nor the defense asked Ramirez about his ability or inability, to speak or comprehend English. Accordingly, the peremptory strike against Ramirez could not have been justifiable because the State could not have plausibly concluded, based on the exchange at the jury venire, that his understanding of English was not sufficient for him to sit as a juror in the case. The fact that the prosecution admitted that it did not seek dismissal of Ramirez for cause because it did not think about his inability to speak English at the time lends even further credence to the argument that the State’s race-neutral basis for dismissing Ramirez was pretextual. Thus, given the false and therefore purely pretextual nature of the challenge, all three elements of
 
 Batson
 
 were violated.
 
 [21]
 

 
 *425
 
 B.
 
 Prospective juror Nelson
 

 The State advanced the following purported race-neutral justification for its challenge of prospective juror Nelson:
 

 [Nelson] was adamant about his divorce. ... I would be concerned about his ability to work with . . . women on the jury and about — I was concerned about his ability to work with the people on the jury in that regards.
 

 Diomampo contends that there is no evidence that Nelson was “adamant about his divorce.” In this, he asserts that another potential juror, juror Nachtigall claimed that domestic violence marked her marriage and was having a “war” over money with her husband.
 
 [22]
 
 Diomampo further argues that at least two other nonminority jurors described themselves as divorced and were not excused.
 

 We conclude that the State violated
 
 Batson
 
 in dismissing Nelson. In this, we determine that the record does not support the conclusion that Nelson was “adamant” about his divorce or would be unable to interact with female jurors. Nelson merely stated that he was “divorced.” Nachtigall, on the other hand, characterized her divorce as a “war” and appeared to have a far more extreme response than Nelson. Because the prosecutor failed to ask followup questions of Nelson and subsequently failed to dismiss nonminority jurors who were also divorced under comparable or worse circumstances, we conclude that the State’s reasons for dismissing Nelson were pretextual in nature.
 

 C.
 
 Prospective juror Benitez
 

 The State advanced the following purported race-neutral justification for its challenge of prospective juror Benitez:
 

 Benitez . . . was adamant . . . that if the State was to prosecute her in a case everything would have to be perfect ... she made mention of the fact that everything would have to be done perfectly or something to that extent when asked by the defense about the level of work that the State
 
 *426
 
 would have to do in investigating the case, and I thought that that was unfair ....
 

 Diomampo argues that Benitez never stated that she expected a criminal investigation to be perfect, merely that she expected the police to investigate everything in the case, even to prove her innocence. In addition, he asserts that two other nonminority jurors provided the same response as Benitez and were not dismissed.
 
 [23]
 
 Diomampo further claims that it was the defense, not the prosecution, that questioned the jurors about law enforcement and the duty to investigate; he contends that if the prosecutor was actually concerned about the race-neutral reasons for the dismissals, he could have asked follow-up questions instead of passing her for cause.
 

 We conclude that Diomampo’s
 
 Batson
 
 challenge as to Benitez lacks merit. As the State argues, Benitez made it clear that she believed that the police had the burden of investigating every issue to ensure that the defendant was innocent. Specifically, she stated that she would expect that the police would “investigate everything, [sic] little thing as possible to prove that I’m innocent.” Also, her response was distinguishable from responses by the other prospective jurors to the same line of questioning. Specifically, as previously noted, one juror stated that he did not expect the police to prove his innocence, and the other indicated that she expected the ■police to do the best possible job. As a result, we conclude that the State provided a plausible nonpretextual, race-neutral justification for dismissing Benitez. This is consistent with the basic purpose of peremptory challenges: “ ‘to allow parties to remove potential jurors whom they suspect, but cannot prove, may exhibit a particular bias.’ ”
 
 [24]
 

 D.
 
 Prospective juror Elliott
 

 The State advanced the following purported race-neutral justification for its challenge of prospective juror Elliott:
 

 
 *427
 
 Elliott . . . seemed easily sidetracked. She told a number of stories . . . she had multiple concerns as far as her modeling career and her nursing career and . . . parents ....
 

 Diomampo argues that the State mischaracterized Elliott as someone who was easily sidetracked and that there was no evidence to support such a claim.
 
 [25]
 
 Rather, he claims that Elliott was “rational, coherent, and thoughtful.”
 

 We conclude that Diomampo’s argument is without merit. Under the second prong of
 
 Batson,
 
 the reason for a peremptory challenge need not be “persuasive or even plausible.”
 
 [26]
 
 The State justified its challenge of Elliott on her statement that she had to care for her parents. This explanation is at least plausible, if not persuasive. The State could have, under the second prong of
 
 Batson,
 
 suspected but lacked the ability to prove that Elliott was “preoccupied and unfocused.” Accordingly, the State’s race-neutral justifications with respect to Elliott embody precisely the type of issues that peremptory challenges are provided to combat, and the district court properly overruled the
 
 Batson
 
 challenge as to Elliott.
 

 We conclude that the two
 
 Batson
 
 violations identified above require reversal and remand for a new trial as a matter of law.
 

 Post-Miranda silence
 

 Diomampo argues that Officer Wojcik commented on his post-
 
 Miranda
 
 silence in violation of the Fifth Amendment privilege against self-incrimination.
 
 [27]
 
 He also asserts that the comment constituted harmful error because the case against him was ‘ ‘marginal at best’ ’ and, therefore, the comment about his silence could have made the difference as to whether he was convicted.
 

 We recently held in
 
 Gaxiola v. State
 
 that ‘ ‘ ‘the prosecution is forbidden at trial to comment upon an accused’s election to remain silent following his arrest and after he has been advised of his rights.’ ”
 
 [28]
 
 However, a “mere passing reference” to
 
 post-Miranda
 
 silence “without more, does not mandate an automatic reversal.”
 
 [29]
 
 
 *428
 
 In reviewing claims of nonstructural, constitutional error, we must determine whether the district court erred, and if so, we must reverse unless the error is harmless beyond a reasonable doubt, i.e., reversal is unwarranted if we conclude “ ‘without reservation that the verdict would have been the same in the absence of error.’ ”
 
 [30]
 
 Accordingly, we “‘will not reverse a conviction when the state comments on post-arrest silence if the comments were harmless beyond a reasonable doubt.’ ”
 
 [31]
 
 We therefore review Diomampo’s claim to determine whether any error occurred and, if so, whether it was harmless in nature.
 

 We conclude that, when considered in the context of the full record generated at trial, the State’s questions and comments at trial regarding Diomampo’s
 
 post-Miranda
 
 silence were more than “mere passing reference[s]”
 
 [32]
 
 and were not harmless beyond a reasonable doubt. Specifically, the prosecutor asked two questions of Officer Wojcik regarding Diomampo’s silence. The first question, which asked whether Diomampo understood his rights, called attention to the fact that Diomampo had the right to remain silent. The second question, which asked whether Diomampo said anything after being read his
 
 Miranda
 
 rights, focused upon the fact that Diomampo remained silent thereafter.
 

 We conclude that the jury could have drawn improper conclusions about Diomampo’s silence based on the prosecutor’s questions and the officer’s answer and the failure of the district court to strike the testimony from the record or provide a limiting instruction to the jury. While Officer Wojcik’s testimony on this subject was quite brief, Officer Gabron also commented during his separate trial testimony that Diomampo “refused to speak to them any further’ ’ after he was read his
 
 Miranda
 
 rights. This, unfortunately, reinforced any inappropriate meaning that could have been drawn from Officer Wojcik’s testimony concerning Diomampo’s silence. Accordingly, because Diomampo was not the owner of the vehicle and the trafficking level of contraband was found under the passenger seat of that vehicle, and because the State’s theory of criminal liability was not based upon his direct physical possession of the contraband at the time it was discovered by police, we cannot conclude that this error was harmless beyond a reasonable
 
 *429
 
 doubt. For this further reason, the judgment of conviction must be reversed and this matter remanded for a new trial.
 

 Evidence of prior bad acts
 

 Diomampo contends that the State improperly introduced several instances of “prior bad acts” in violation of NRS 48.045(2). In this, he argues that the State improperly suggested, through the questioning of Officer Wojcik, that “methamphetamine users ‘normally’ support their habit by robbing and burglarizing people’ ’ and that Diomampo “appeared to be driving while under the influence of a controlled substance.” He also claims that the prosecutor improperly admitted evidence of the “narcotics kit” and scale found on Diomampo’s person. According to Diomampo, the district court, in admitting the alleged prior bad act evidence without a separate hearing to determine admissibility, violated his due process rights to a fair trial.
 
 [33]
 
 Specifically, he claims that the alleged prior bad act evidence was more prejudicial than probative, especially given the fact that it was not accompanied by limiting instructions.
 
 [34]
 
 The State, in response, asserts that because Diomampo failed to object to the alleged prior bad act testimony at trial he failed to preserve the issue for review on appeal.
 
 [35]
 

 NRS 48.045(2), which governs the admissibility of evidence of prior bad acts, provides that
 

 [ejvidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. [Such evidence] may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 

 Because prior bad act evidence “forces the accused to defend himself against vague and unsubstantiated charges and may result in a conviction because the jury believes the defendant to be a bad person,’ ’ it is commonly reversible error to use uncharged bad acts to show criminal propensity.
 
 [36]
 
 However, as we held in
 
 Braunstein
 
 v.
 
 State,
 
 “[t]he trial court’s determination to admit or exclude evidence of prior bad acts is a decision within its discretionary au
 
 *430
 
 thority and is to be given great deference. It will not be reversed absent manifest error.”
 
 [37]
 

 Under
 
 Petrocelli v.
 
 State,
 
 [38]
 
 in order to admit evidence of prior bad acts, the district court must conduct a hearing outside the presence of the jury and determine “that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.”
 
 [39]
 
 Nevertheless, failure to conduct a
 
 Petrocelli
 
 hearing is not reversible error when the record is sufficient to establish that the evidence is admissible under the test outlined above or the trial result would have been the same had the trial court excluded the evidence.
 
 [40]
 

 We review claims of nonconstitutional error under NRS 178.598 to determine if the error “ ‘had substantial and injurious effect or influence in determining the jury’s verdict.’ ’ ’
 
 [41]
 
 In addition, generally, unobjected to errors are not preserved for appellate review.
 
 [42]
 
 Nonetheless,
 

 “this court has the discretion to address an error if it was plain and affected the defendant’s substantial rights.” In conducting plain error review, we must examine whether there was “error,” whether the error was “plain” or clear, and whether the error affected the defendant’s substantial rights. Additionally, the burden is on the defendant to show actual prejudice or a miscarriage of justice.
 
 [43]
 

 While the State correctly observed that Diomampo failed to object or seek a curative instruction from the trial court concerning the evidence that methamphetamine users have certain propensities, we conclude that this claim upon appeal is subject to a plain error analysis and that the record below demonstrates plain error.
 
 [44]
 
 
 *431
 
 Specifically, admitting Officer Wojcik’s testimony that methamphetamine users normally support their habits by committing robberies affected Diomampo’s substantial rights because it permitted the jury to draw inferences about Diomampo’s character and his conforming propensity to commit other crimes. In addition, this testimony was not “prior bad act” evidence admissible as an exception to the prohibitions in NRS 48.045(2) concerning character evidence. And, given that Diomampo was not the owner of the vehicle that he was driving and no confirmed methamphetamine was found on his person, Officer Wojcik’s testimony likely had a substantial and injurious effect on the outcome of the case. Accordingly, the district court committed reversible error in admitting the portion of Officer Wojcik’s testimony that related to the practices of methamphetamine users.
 

 With regard to the evidence of Diomampo’s impairment, we conclude that Diomampo did lodge a timely objection to that evidence, and therefore we review this claim on its merits. We conclude that Officer Wojcik’s testimony that Diomampo appeared to be impaired upon being stopped by officers was admissible on the question of intent to possess and that failure to conduct a hearing, as per
 
 Petrocelli,
 
 does not in and of itself compel reversal in this case.
 

 As to Diomampo’s claim of error concerning the “narcotics kit” and the scale, we conclude that Diomampo waived this claim of error on appeal and plain error review is inappropriate. We further conclude that this evidence would have been admissible in any event, notwithstanding the lack of a hearing under
 
 Petrocelli,
 
 because the kit and scale were relevant to the question of intent, were established by clear and convincing evidence, and their probative value clearly outweighed any considerations of unfair prejudice.
 
 [45]
 

 Warrantless vehicle search
 

 Diomampo argues that police lacked sufficient justification under the Fourth Amendment to conduct a warrantless search of the vehicle, incident to the arrest, for weapons or to inventory its contents.
 
 [46]
 
 More specifically, he claims that his vehicle was impounded in violation of LVMPD policy because the arresting officers did not attempt to contact the vehicle’s registered owner.
 
 *432
 
 Diomampo also asserts that the officers merely prepared a “tow sheet’ ’ that failed to provide a complete list of the items recovered from the vehicle.
 
 [47]
 

 As we held in
 
 Weintraub
 
 v.
 
 State,
 
 ‘ ‘ [an] inventory search must be carried out pursuant to standardized official department procedures and must be administered in good faith in order to pass constitutional muster.’ ’
 
 [48]
 
 Indeed, the United States Supreme Court has held that an inventory search is per se reasonable, and accordingly constitutional, when it complies with police department policies.
 
 [49]
 
 In addition, in Nevada, under certain circumstances, police officers may actually have an obligation to conduct an inventory search.
 
 [50]
 
 Nonetheless, the “ ‘inventory search must not be a ruse for general rummaging in order to discover incriminating evidence.’ ”
 
 [51]
 

 We conclude that the inventory search of Diomampo’s vehicle was reasonable under the Fourth Amendment. According to LVMPD policy, officers must have at least one valid cause for impounding and, subsequently, conducting an inventory search of a vehicle. In this, LVMPD policy provides cause to impound a vehicle “[w]hen ownership and rightful possession by the driver is in doubt” or “[w]hen an abandoned vehicle causes an immediate threat to other motorists by its location or cargo, immediately after citing the vehicle.”
 

 Both considerations justify an inventory search of the vehicle here. First, the inventory search was justified because neither Diomampo nor Olsen were the registered owner of the vehicle or
 
 *433
 
 had a valid driver’s license. Second, as in
 
 Collins v. State,
 
 the impound and subsequent inventory search were reasonable because the vehicle was parked in an unsecured location, obstructing traffic.
 
 [52]
 
 Beyond that, contrary to Diomampo’s claims, there is no requirement that police contact the registered owner of the vehicle prior to conducting an inventory search under either of these policies. In short, failure to notify the vehicle owner does not negate the validity of an inventory search conducted thereunder. Accordingly, the district court properly denied Diomampo’s motion to suppress evidence.
 

 Sufficiency of the evidence
 

 Diomampo argues that the prosecution failed to provide sufficient evidence in this case to sustain his conviction. Specifically, he claims that no methamphetamine was found on his person and the district court judge indicated uncertainty over whether “[the] jury was going to convict.” We conclude that Diomampo’s argument is without merit.
 

 We have held that “‘[insufficiency of the evidence occurs where the prosecution has not produced a minimum threshold of evidence upon which a conviction may be based.’ ”
 
 [53]
 
 In determining the sufficiency of the evidence on appeal, “the critical question is ‘ “whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” ’ ”
 
 [54]
 
 In addition, “ ‘[w]here there is substantial evidence to support a verdict in a criminal case ... the reviewing court will not disturb the verdict nor set aside the judgment.’ ’ ’
 
 [55]
 

 Here, the officers found drug paraphernalia on Diomampo’s person and methamphetamine in the vehicle he was driving pursuant to a lawful inventory search. The district court judge’s speculation as to whether Diomampo would be convicted does not in any respect demonstrate the insufficiency of the evidence. Accord
 
 *434
 
 ingly, apart from the errors identified above, we conclude that the State presented sufficient evidence to sustain Diomampo’s conviction.
 

 CONCLUSION
 

 The violation of
 
 Batson
 
 compels reversal of the judgment of conviction in this matter. Moreover, because Diomampo was not the owner of the vehicle and the trafficking level of contraband was found under the passenger seat of that vehicle, and because the State’s theory of criminal liability was not based upon direct physical possession at the point of police contact, we cannot conclude that the comments on Diomampo’s
 
 post-Miranda
 
 silence were harmless beyond a reasonable doubt. Finally, the improper admission of character evidence in violation of NRS 48.045(2) also mandates reversal. Accordingly, we reverse the judgment of conviction and remand this matter for a new trial.
 

 Gibbons, C. J., Hardesty, Parraguirre, Douglas, Cherry and Saitta, JJ., concur.
 

 [1]
 

 476 U.S. 79 (1986).
 

 [2]
 

 NRS 453.3385.
 

 [3]
 

 See
 
 Miranda v. Arizona,
 
 384 U.S. 436 (1966).
 

 [4]
 

 101 Nev. 46, 692 P.2d 503 (1985),
 
 modified by Sonner v. State,
 
 112 Nev. 1328, 1333-34, 930 P.2d 707, 711-12 (1996),
 
 and superseded in part by statute as stated in Thomas v. State,
 
 120 Nev. 37, 45, 83 P.3d 818, 823 (2004).
 

 [5]
 

 117 Nev. 725, 30 P.3d 1128 (2001).
 

 [6]
 

 Olsen was already under arrest and had been placed in the patrol car at that point.
 

 [7]
 

 Officer Wojcik later testified at trial that such pipes are often used to smoke methamphetamine.
 

 [8]
 

 Two of the challenged jurors were African-American and two were Hispanic.
 

 [9]
 

 Walker v.
 
 State, 113 Nev. 853, 867, 944 P.2d 762, 771 (1997);
 
 see State of Nevada
 
 v.
 
 McClear,
 
 11 Nev. 39 (1876). Diomampo notes that, under Article 4, Section 27 of the Nevada Constitution, all qualified electors have the right to serve on a jury unless “convicted of bribery, perjury, forgery, larceny or other high crimes” and that, according to NRS 6.010, a qualified juror is one who is a qualified elector and “who has sufficient knowledge of the English language, and who has not been convicted of treason, a felony, or other infamous crime, and who is not rendered incapable by reason of physical or mental infirmity.” Although he concedes that qualified electors in Nevada may be excused for cause or without cause by peremptory challenge,
 
 see
 
 NRS 6.030, NRS 175.036, and NRS 175.051, he argues that under
 
 Batson
 
 those challenges must satisfy considerations of equal protection.
 

 [10]
 

 See U.S. v.
 
 Lorenzo, 995 F.2d 1448, 1453-54 (9th Cir. 1993).
 

 [11]
 

 476 U.S. 79 (1986).
 

 [12]
 

 Id.
 
 at 86.
 

 [13]
 

 Id.
 
 at 96-98.
 

 [14]
 

 514 U.S. 765, 767-68 (1995).
 

 [15]
 

 Id.
 
 at 769.
 

 [16]
 

 122 Nev. 398, 132 P.3d 574 (2006).
 

 [17]
 

 Id. at 403, 132 P.3d at 578 (citing
 
 Kaczmarek v. State,
 
 120 Nev. 314, 333, 91 P.3d 16, 29 (2004)).
 

 [18]
 

 Id.
 
 In this, we note that the relevant factors in determining whether a race-neutral justification for a peremptory challenge is merely pretextual are
 

 (1) the similarity of the answers to voir dire questions given by [minority] prospective jurors who were struck by the prosecutors and answers by [nonminority] prospective jurors who were not struck, (2) the disparate questioning by the prosecutors of [minority] and [nonminority] prospective jurors, (3) the use by the prosecutors of the “jury shuffle,” and (4) evidence of historical discrimination against minorities in jury selection by the district attorney’s office.
 

 Id.
 
 at 405, 132 P.3d at 578-79.
 

 [19]
 

 Walker v. State,
 
 113 Nev. 853, 867-68, 944 P.2d 762, 771-72 (1997) (quoting
 
 Hernandez
 
 v.
 
 New York,
 
 500 U.S. 352, 364 (1991) (plurality opinion)).
 

 [20]
 

 The Court in
 
 Batson v. Kentucky
 
 stated that “[i]f the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner’s conviction be reversed.” 476 U.S. 79, 100 (1986);
 
 see also People v. Rodriguez,
 
 58 Cal. Rptr. 2d 108, 109 (Ct. App. 1996) (stating that “[u]nder almost any conceivable set of circumstances”
 
 Bat-son
 
 error is per se reversible).
 

 [21]
 

 We do not reach the issue of whether using a peremptory challenge to dismiss a minority juror because of a true language barrier constitutes de facto
 
 *425
 
 discrimination. In this, we distinguish this case from
 
 Hernandez v. New York,
 
 in which the United States Supreme Court stated, in dicta, that “a policy of striking all who speak a given language, without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination.” 500 U.S. 352, 371-72 (1991) (plurality opinion). Specifically, we conclude that the State did not strike Ramirez because he speaks a particular language but because of his purported inability to speak English. We are, accordingly, unwilling to apply the
 
 Hernandez
 
 dictum to the facts here.
 

 [22]
 

 While the record indicates that juror Nachtigall’s name is of German origin, neither party contends that she is either a minority or nonminority.
 

 [23]
 

 In this, Diomampo claims that juror Bidwell, a nonminority juror selected to serve, indicated that he would expect the State to
 

 examine the evidence, file most of the evidence, and provide some sort of report. I probably wouldn’t expect them to try to prove my innocence because they’re usually gathering evidence, in my opinion, to find somebody at fault.
 

 Diomampo further claims that juror Frost, another nonminority juror on the final panel, stated that she would “expect [Metro] to do the best possible job.”
 

 [24]
 

 Ford v. State,
 
 122 Nev. 398, 409, 132 P.3d 574, 581 (2006) (quoting
 
 Miller-El
 
 v.
 
 Dretke,
 
 545 U.S. 231, 292-93 (2005) (Thomas, J., dissenting)).
 

 [25]
 

 Diomampo argues for the first time in his reply brief that juror Delee also appeared to be easily sidetracked. However, given that he did not make the argument in his opening brief, we do not consider it here.
 
 See Blouin v. Blouin,
 
 67 Nev. 314, 317-18, 218 P.2d 937, 938 (1950). We also conclude that Delee’s voir dire does not appear to prove that the State’s race-neutral justification as to Elliott was pretextual.
 

 [26]
 

 Ford,
 
 122 Nev. at 403, 132 P.3d at 577-78.
 

 [27]
 

 Gaxiola v. State,
 
 121 Nev. 638, 655, 119 P.3d 1225, 1237 (2005).
 

 [28]
 

 Id.
 
 at 655, 119 P.3d at 1237 (quoting
 
 McGee v. State,
 
 102 Nev. 458, 461, 725 P.2d 1215, 1217 (1986)).
 

 [29]
 

 Shepp v. State,
 
 87 Nev. 179, 181, 484 P.2d 563, 564 (1971),
 
 overruled on other grounds by Stowe v. State,
 
 109 Nev. 743, 746, 857 P.2d 15, 17 (1993).
 

 [30]
 

 Schoels v. State,
 
 115 Nev. 33, 35, 975 P.2d 1275, 1276 (1999) (quoting
 
 Homick
 
 v.
 
 State,
 
 112 Nev. 304, 316, 913 P.2d 1280, 1288 (1996));
 
 see also Obermeyer v. State,
 
 97 Nev. 158, 162, 625 P.2d 95, 97 (1981) (holding that “[w]here a constitutional error has been committed, a conviction of guilty may be allowed to stand if the error is determined to be harmless beyond a reasonable doubt”).
 

 [31]
 

 Gaxiola,
 
 121 Nev. at 655, 119 P.3d at 1237 (quoting
 
 Washington v. State,
 
 112 Nev. 1054, 1060, 921 P.2d 1253, 1257 (1996)).
 

 [32]
 

 Shepp,
 
 87 Nev. at 181, 484 P.2d at 564.
 

 [33]
 

 See Petrocelli
 
 v.
 
 State,
 
 101 Nev. 46, 692 P.2d 503 (1985),
 
 modified by Sonner
 
 v.
 
 State,
 
 112 Nev. 1328, 1333-34, 930 P.2d 707, 711-12 (1996),
 
 and superseded in part by statute as stated in Thomas v. State,
 
 120 Nev. 37, 45, 83 P.3d 818, 823 (2004).
 

 [34]
 

 Tavares
 
 v.
 
 State,
 
 117 Nev. 725, 732-33, 30 P.3d 1128, 1133 (2001);
 
 Petrocelli,
 
 101 Nev. at 52, 692 P.2d at 508.
 

 [35]
 

 See McCullough v. State, 99
 
 Nev. 72, 74, 657 P.2d 1157, 1158 (1983).
 

 [36]
 

 Braunstein v. State,
 
 118 Nev. 68, 73, 40 P.3d 413, 417 (2002).
 

 [37]
 

 118 Nev at 72, 40 P.3d at 416.
 

 [38]
 

 101 Nev. 46, 692 P.2d 503.
 

 [39]
 

 Tinch
 
 v.
 
 State,
 
 113 Nev 1170, 1176, 946 P.2d 1061, 1065 (1997) (citing
 
 Walker v. State,
 
 112 Nev. 819, 824, 921 P.2d 923, 926 (1996)).
 

 [40]
 

 101 Nev. at 52, 692 P.2d at 508.
 

 [41]
 

 Tavares
 
 v.
 
 State,
 
 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (quoting
 
 Kotteakos
 
 v.
 
 United States,
 
 328 U.S. 750, 776 (1946)).
 

 [42]
 

 Green v. State,
 
 119 Nev. 542, 545, 80 P.3d 93, 94-95 (2003).
 

 [43]
 

 Id.
 
 (quoting
 
 Gallego v. State,
 
 117 Nev. 348, 365, 23 P.3d 227, 239 (2001)).
 

 [44]
 

 See Green,
 
 119 Nev. at 545, 80 P.3d at 94-95.
 

 [45]
 

 See
 
 Tinch v. State,
 
 113 Nev. 1170, 946 P.2d 1061 (1997).
 

 [46]
 

 Because the State only argues that the search of the vehicle was a constitutional inventory search, we do not evaluate Diomampo’s arguments as to whether the search was lawfully conducted incident to arrest or based on a reasonable belief that there were weapons in the vehicle.
 

 [47]
 

 Specifically, Diomampo contends that police “failed to list all of the items recovered” from the vehicle and that “an officer conducting an impound report should list more than just a small fraction of the items located within the vehicle.” However, he does not identify which items were excluded from the impound report. In addition, because the “tow sheet” in this case was essentially complete, the situation here is obviously distinguishable from this court’s holding in
 
 Weintraub v. State,
 
 where the completed impound sheet only listed 8 out of approximately 100 items recovered from the impounded vehicle. 110 Nev. 287, 289, 871 P.2d 339, 340 (1994).
 

 [48]
 

 110 Nev. at 288, 871 P.2d at 340.
 

 [49]
 

 See South Dakota
 
 v.
 
 Opperman,
 
 428 U.S. 364, 376 (1976).
 

 [50]
 

 Collins v. State,
 
 113 Nev. 1177, 1181, 946 P.2d 1055, 1059 (1997). In
 
 Collins,
 
 the impounded vehicle “was in an unsecured parking lot and no evidence exist[ed] that the car or its valuables would remain safe. . . . Accordingly, . . . Trooper Gager did not act unreasonably in having the car taken to a more secure location.”
 
 Id.
 

 [51]
 

 State
 
 v.
 
 Greenwald,
 
 109 Nev. 808, 810, 858 P.2d 36, 37 (1993) (quoting
 
 Florida
 
 v.
 
 Wells,
 
 495 U.S. 1, 4 (1990)).
 

 [52]
 

 Officer Wojcik testified at trial that “the vehicle was pulled over in a roadway obstructing traffic.’ ’
 

 [53]
 

 Mejia
 
 v.
 
 State,
 
 122 Nev. 487, 492, 134 P.3d 722, 725 (2006) (quoting
 
 State v. Walker,
 
 109 Nev. 683, 685, 857 P.2d 1, 2 (1993)).
 

 [54]
 

 7d. at 492, 134 P.3d at 725 (quoting
 
 Koza
 
 v.
 
 State,
 
 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319 (1979))).
 

 [55]
 

 Cunningham v. State,
 
 94 Nev. 128, 130, 575 P.2d 936, 937 (1978) (quoting
 
 Hankins
 
 v.
 
 State,
 
 91 Nev. 477, 477-78, 538 P.2d 167, 168 (1975)).