**132 Nev., Advance Opinion 20**

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| JASON DUVAL MCCARTY,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 58101 |



FILED

MAR 3 1 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of two counts of first-degree murder with the use of a deadly weapon, one count of conspiracy to commit murder, two counts of conspiracy to commit kidnapping, three counts of first-degree kidnapping, two counts of robbery with the use of a deadly weapon, and one count each of conspiracy to commit burglary, burglary, battery with substantial bodily harm, robbery, and pandering. Appellant was sentenced to death for each murder. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

*Reversed and remanded.*

Christopher R. Oram, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Marc P. DiGiacomo and Ryan J. MacDonald, Deputy District Attorneys, Clark County,
for Respondent.

SUPREME COURT
OF
NEVADA

(O) 1947A

8/24/16: Corrected per letter to publishers. CJ

16 - 10013

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, CHERRY, J.:

Jason Duval McCarty was convicted of multiple felony counts related to the kidnapping and murder of Charlotte Combado and Victoria McGee. In two interviews with police after his initial appearance before a magistrate, McCarty denied killing the women or being present when they were killed, instead implicating Domonic Malone, but he admitted to helping to discard evidence. The district court denied a motion to suppress the statements made in those interviews, and McCarty challenges that decision on appeal. We conclude that McCarty's Sixth Amendment right to counsel attached at his initial appearance before a magistrate but that he waived his right to have counsel present at the subsequent interviews when he was informed of his rights consistent with *Miranda v. Arizona*, 384 U.S. 436 (1966), and chose to speak with police without counsel. Although McCarty is not entitled to relief on that issue, an error during jury selection requires that we reverse the judgment of conviction and remand for a new trial. In particular, after considering all the relevant circumstances, we conclude that the district court committed clear error when it rejected McCarty's objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the State's use of a peremptory challenge to remove an African American from the venire.

I.

McCarty was arrested on the evening of May 25, 2006. The supporting Declaration of Arrest identifies numerous charges, including two counts of murder with the use of a deadly weapon, three counts of kidnapping, three counts of conspiracy, and battery causing substantial

bodily harm. According to the Henderson Township Justice Court's minutes, McCarty first appeared before a magistrate on May 30, 2006, five days after he was arrested. At that time, McCarty was denied bail on the murder charges and bail was set at $2 million on "all other charges." Eight days later, counsel was appointed to represent him when he appeared for arraignment. During the eight days between his initial appearance and his arraignment, McCarty was interrogated by the State on two occasions. He contends that the statements he made during the interrogations should have been suppressed because detectives deliberately elicited incriminating statements after his Sixth Amendment right to counsel attached. The State contends that McCarty's Sixth Amendment right to counsel did not attach until the district attorney filed "formal" charges on June 7, 2006, the same date that McCarty appeared for arraignment and was appointed counsel. Both McCarty and the State are mistaken.

A.

We first address the State's misconception about when the Sixth Amendment right to counsel attaches. The Sixth Amendment provides that, "[i]n all prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. As the Supreme Court has explained, the Sixth Amendment right to counsel "is limited by its terms," and therefore, "'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisonsin*, 501 U.S. 171, 175 (1991)); *see also Dewey v. State*, 123 Nev. 483, 488, 169 P.3d 1149, 1152 (2007) (stating that the "right to counsel is triggered at or after the time that judicial proceedings have been initiated" (quotation marks omitted)).

SUPREME COURT
OF
NEVADA

(O) 1947A

Commencement of prosecution, for purposes of the attachment of the right to counsel, has been tied to "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery*, 554 U.S. at 198 (quotation marks omitted). One example of the initiation of judicial proceedings is particularly relevant in this case—an initial appearance before a magistrate.

Beginning as early as 1977, the Supreme Court has held "that the right to counsel attaches at the initial appearance before a judicial officer." *Id.* at 199 (citing *Brewer v. Williams*, 430 U.S. 387, 399 (1977); *Michigan v. Jackson*, 475 U.S. 625, 629 n.3 (1986), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778, 797 (2009). An "initial appearance" has been characterized by the Court as a hearing at which a magistrate informs the defendant of the charge and various rights in further proceedings and determines the conditions for pretrial release. *Id.* Based on the Court's description of an initial appearance, the proceeding in this case in justice court on May 30, 2006, was an initial appearance: McCarty was in custody on a declaration of arrest that set forth specific charges and probable cause to support those charges, was brought before a magistrate who informed him of his right to counsel, his right to remain silent, and his right to a preliminary hearing and who had already determined the conditions for pretrial release (as part of a probable cause review on May 27). Contrary to the State's assertion, the fact that the district attorney had not yet filed "formal" charges is irrelevant. *Id.* at 194-95 (rejecting argument that attachment of the right to counsel "requires that a public prosecutor (as distinct from a police officer) be aware of [the] initial proceeding or involved in its conduct"); *id.* at 207

("[U]nder the federal standard, an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation prompts arraignment and restrictions on the accused's liberty to facilitate prosecution."); *id.* at 210 (observing that "an initial appearance following a charge signifies a sufficient commitment to prosecute regardless of a prosecutor's participation, indictment, information, or what the County calls a 'formal' complaint"). McCarty's Sixth Amendment right to counsel attached on May 30, 2006.

### B.

"Whether the right has been violated and whether [McCarty] suffered cognizable harm are separate questions from when the right attaches." *Rothgery*, 554 U.S. at 212 n.17; *see also id.* at 212 n.15 ("We do not here purport to set out the scope of an individual's postattachment right to the presence of counsel. It is enough for present purposes to highlight that the enquiry into that right is a different one from the attachment analysis."); *id.* at 213-14 (Alito, J., concurring) ("As I interpret our precedents, the term 'attachment' signifies nothing more than the beginning of the defendant's prosecution. It does not mark the beginning of a substantive entitlement to the assistance of counsel."). "Once attachment occurs," the defendant "is entitled to the presence of counsel during any 'critical stage' of the postattachment proceedings." *Id.* at 212. "Thus, counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Id.*

After the right to counsel attached in this case, eight days passed before counsel was appointed. During that time, McCarty was interviewed by police on two occasions (June 1 and June 6). The Supreme

Court has held that postattachment interrogation by the State is a critical stage at which the defendant has a right to be represented by counsel. *Montejo*, 556 U.S. at 786 (citing *Massiah v. United States*, 377 U.S. 201, 204-05 (1964)). It is undisputed that McCarty did not have counsel present during the postattachment interrogations. Although it is arguable that the eight-day delay in the appointment of counsel was unreasonable, as the Supreme Court has "place[d] beyond doubt," the defendant may waive the Sixth Amendment right to counsel, "so long as relinquishment of the right is voluntary, knowing, and intelligent." *Id.* "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.*

Here, the district court found, after a hearing on the motion to suppress, that McCarty "had been Mirandized." According to the Supreme Court, "when a defendant is read his *Miranda* rights (which includes the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick" because even though the *Miranda* rights have their foundation in the Fifth Amendment, a *Miranda* advisement is sufficient to apprise a defendant of the nature of his Sixth Amendment rights and the consequences of abandoning those rights. *Id.* at 786-87 (citing *Patterson v. Illinois*, 487 U.S. 285, 296 (1988)). Because McCarty has failed to demonstrate that his *Miranda* waiver was not voluntary, knowing, and intelligent, we cannot say that there was a Sixth Amendment violation that would have required the district court to grant the motion to suppress.

## II.

McCarty also contends that the State engaged in discriminatory jury selection when it exercised peremptory strikes to

SUPREME COURT
OF
NEVADA

(O) 1947A

remove two African-American prospective jurors from the venire. "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986). Discriminatory jury selection is particularly concerning in capital cases where each juror has the power to decide whether the defendant is deserving of the ultimate penalty, death.

## A.

At the beginning of McCarty's trial, the district court held five days of voir dire, narrowing the venire to 36 prospective jurors after for-cause challenges. The State exercised ten peremptory challenges, using two of them to strike two of the three remaining African Americans in the venire. McCarty objected to those two peremptory challenges as discriminatory, focusing primarily on prospective juror number 36, a married 28-year-old African-American mother of two who was a full-time college student. In response to McCarty's objection, the State explained that based on prospective juror 36's responses to questions during voir dire, it conducted independent research into her background in an attempt to learn why her brother had been incarcerated. During the course of that investigation, the State conducted a Shared Computer Operations for Protection and Enforcement (SCOPE) background check and learned that she had a valid work card for an adult nightclub.[1] Referring to that information, the prosecution explained to the district court that, "with all due respect, it has nothing to do with the race, but the State of Nevada's

---

[1]The investigation failed to uncover any information about the prospective juror's brother.

not going to leave somebody who works at a strip club on their panel." McCarty argued that the State used prospective juror 36's work card as pretext for purposeful discrimination. When McCarty attempted to point out that prospective juror 36 had obtained the work card "over three years ago" and that she mentioned in her juror questionnaire that she had been a full-time college student for over a year, the district court interrupted defense counsel and told counsel, "[I]t sounds like your argument here is for the Supreme Court. I've made my decision. And I don't mean it in a flippant way . . . [a]nd I am concerned about this, but . . . I've ordered that they show you the SCOPE, and it'll be part of the record, and we can go from there." The court then continued with the peremptory challenges and swore in the jury.

McCarty contends that the district court erred by denying his *Batson* objection because the State's race-neutral explanations were pretext for racial discrimination. In its answering brief, the State fails to mention its strip-club explanation provided to the district court and instead focuses on prospective juror 36's brother, arguing that it struck this prospective juror because her brother was prosecuted by the State 13 years earlier and it did not want jurors who had family members who had been convicted of a violent crime to serve on the jury. Having considered all the circumstances surrounding McCarty's *Batson* objection, we conclude that the district court clearly erred.

B.

An equal protection challenge to the exercise of a peremptory challenge is evaluated using the three-step analysis set forth by the United States Supreme Court in *Batson*. *Kaczmarek v. State*, 120 Nev. 314, 332, 91 P.3d 16, 29 (2004); *see also Purkett v. Elem*, 514 U.S. 765, 767

(1995) (summarizing the three-step *Batson* analysis). First, "the opponent of the peremptory challenge must make out a prima facie case of discrimination." *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006). Then, "the production burden . . . shifts to the proponent of the challenge to assert a neutral explanation for the challenge," *id.*, that is "clear and reasonably specific," *Purkett*, 514 U.S. at 768 (internal quotation marks omitted). Finally, "the trial court must . . . decide whether the opponent of the challenge has proved purposeful discrimination." *Ford*, 122 Nev. at 403, 132 P.3d at 577. "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal quotation marks omitted). We review the district court's ruling on the issue of discriminatory intent for clear error. *See Libby v. State*, 115 Nev. 45, 55, 975 P.2d 833, 839 (1999). In this case, we only address the third step of the *Batson* inquiry because the district court's decision at step one is moot, *see Hernandez v. New York*, 500 U.S. 352, 359 (1991), and McCarty does not argue that the State's explanations for striking the prospective jurors were facially discriminatory, *see Purkett*, 514 U.S. at 768 (explaining that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral" at step two (internal quotation marks omitted)).

As we recently discussed in our opinion in *Hawkins v. State*, the defendant bears a heavy burden in demonstrating that the State's facially race-neutral explanation is pretext for discrimination. 127 Nev. 575, 578-79, 256 P.3d 965, 967 (2011). In order to carry that burden, the

SUPREME COURT
OF
NEVADA

(O) 1947A

defendant *must* offer some analysis of the relevant considerations which is sufficient to demonstrate that it is more likely than not that the State engaged in purposeful discrimination. Considerations that are relevant at the third step include, but are not limited to: (1) the similarity of answers to voir dire questions given by jurors who were struck by the prosecutor and answers by those jurors of another race or ethnicity who remained in the venire, (2) the disparate questioning by the prosecutors of struck jurors and those jurors of another race or ethnicity who remained in the venire, (3) the prosecutors' use of the "jury shuffle," and (4) "evidence of historical discrimination against minorities in jury selection by the district attorney's office." *Id.* at 578, 256 P.3d at 967. "An implausible or fantastic justification by the State may, and probably will, be found to be pretext for intentional discrimination." *Ford*, 122 Nev. at 404, 132 P.3d at 578.

The district court also plays an important role during step three of the *Batson* inquiry and must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and "consider all relevant circumstances" before ruling on a *Batson* objection. *Batson*, 476 U.S. at 93, 96 (internal quotation marks omitted); *see also Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). "A district court may not unreasonably limit the defendant's opportunity to prove that the prosecutor's reasons for striking minority veniremembers were pretextual." *Conner v. State*, 130 Nev., Adv. Op. 49, 327 P.3d 503, 509 (2014). The district court should sustain the *Batson* objection and deny the peremptory challenge if it is "more likely than not that the challenge was improperly motivated." *Johnson v. California*, 545 U.S. 162, 170 (2005); *see also Williams v. Beard*, 637 F.3d 195, 215 (3d Cir. 2011).

## C.

We turn then to the inquiry that was conducted at step three in this case. Although McCarty challenges the district court's decision at step three with respect to both of the African-American prospective jurors who were struck by the State, we need only consider one of them here. *See Snyder*, 552 U.S. at 478 (explaining that clear error with respect to one juror is sufficient for reversal); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."). In its argument below, the State explained to the district court that it does not want employees of strip clubs to serve as jurors. After a lunch break, and 30 minutes into argument on McCarty's *Batson* objection, the State added that it was also concerned that prospective juror 36 might be upset because the State prosecuted her brother 13 years earlier or that her brother might have committed a violent crime.

We first address the race-neutral explanation initially offered by the State for striking prospective juror 36. The State claimed that it struck prospective juror 36 because "the State of Nevada's not going to leave somebody who works at a strip club on their panel." The State's explanation is troubling because the State admitted that it only ran a SCOPE background check on one of the other 35 prospective jurors remaining in the venire. If, indeed, prospective juror 36's possession of a valid work card for an adult nightclub made the State uneasy, it should have also been worried about the other 34 prospective jurors on whom it did not conduct a SCOPE background check to determine whether they had obtained a valid work card within the last three years. This kind of disparate treatment supports our conclusion that it is more likely than not

SUPREME COURT
OF
NEVADA

(O) 1947A

that the reasons given for striking prospective juror 36 were mere pretext for purposeful discrimination. *See Miller-El v. Dretke*, 545 U.S. 231, 244 (2004).

We acknowledge that this pretext argument was not well developed in the district court and McCarty takes a different tack on appeal. However, McCarty twice alluded to this observation below in the context of challenging the State's use of SCOPE background checks on jurors. He first complained that the defense cannot assess whether the State has articulated a race-neutral reason without equal access to the SCOPEs because the defense had no way of knowing if any of the other potential jurors had work cards. McCarty further argued that "[i]f two of those jurors have stripper cards, then we can show the Court that's not a racially neutral reason." Later, McCarty suggested a hypothetical where a prosecutor accesses an African-American juror's SCOPE in search of a race-neutral reason to strike the juror. He argued that "[i]f the prosecutor were to make a specific election to not examine any other SCOPEs, you have then a mechanism in place where a race-neutral reason can be proffered and the validity of the race-neutral reason can never be challenged." These arguments point to the concern we have in this case that the discovery of juror 36's work card was just a fortuitous excuse to remove this African-American juror. We cannot overlook such a clear instance of discriminatory intent. Considering the State's original reason for conducting the independent background investigation (prospective juror 36's brother's criminal history) and that investigation's failure to yield results, we conclude that the State's strip-club explanation is "'implausible.'" *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30 (quoting *Purkett*, 514 U.S. at 768).

We are also troubled by the district court's handling of McCarty's concern about the accuracy of the work-card information on prospective juror 36's SCOPE. Her SCOPE indicated that she had obtained a work card to serve cocktails at an adult nightclub three years earlier. The juror listed her occupation as "full-time student" in her questionnaire, and she confirmed during voir dire that she was a full-time student studying health-care administration. When McCarty attempted to point out that it was unlikely that prospective juror 36 currently worked at an adult nightclub because she listed her occupation as "full-time student" in her questionnaire and had obtained the work card three years earlier, the district court prevented him from continuing with his argument and told him "it sounds like your argument here is for the Supreme Court." The district court is mistaken. As we recently explained in *Conner*, 130 Nev., Adv. Op. 49, 327 P.3d at 509, it is the district court that "has a duty to assess whether the opponent of the strike has met its burden to prove purposeful discrimination" and the "district court may not unreasonably limit the defendant's opportunity to prove that the prosecutor's reasons for striking minority veniremembers were pretextual."

Here, the district court admitted it was "concerned" about the State's independent investigation into prospective juror 36's background, but it nevertheless disregarded McCarty's attempt to show that it was unlikely that prospective juror 36 currently worked at an adult nightclub. The district court failed to undertake the sensitive inquiry into all the relevant circumstances required by *Batson* and its progeny before rendering its decision. *See Batson*, 476 U.S. at 93, 96. Furthermore, the district court failed to discuss which facts or circumstances alleviated its

concerns about the State's independent investigation and caused it to deny McCarty's *Batson* challenge. We have previously explained that "an adequate discussion of the district court's reasoning may be critical to our ability to assess the district court's resolution of any conflict in the evidence regarding pretext." *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30. The district court's failure to consider all of the relevant circumstances and make a record in this case undermines our confidence in its decision.

The State asks this court to disregard its strip-club explanation and focus on its alternative explanation that it struck prospective juror 36 because her brother was prosecuted by the State 13 years earlier, and it did not want veniremembers who had family members who had been convicted of a violent crime to serve as jurors. But, there is no evidence that prospective juror 36's brother was ever convicted of a violent crime. Furthermore, when prospective juror 36 told the State that she had "very little" relationship with her brother and, based on the limited information she had about his prosecution, she believed the State treated him fairly, the prosecutor responded, "So obviously . . . you don't harbor any resentment against my office." The State also fails to mention that it did not offer its alternative explanation until after McCarty attacked its first race-neutral explanation as pretextual. *Cf. Miller-El*, 545 U.S. at 246 (finding it difficult to credit the State's alternative race-neutral explanation because of its pretextual timing).

Nonetheless, we have considered the State's alternative explanation. Like prospective juror 36, three other prospective jurors who were not struck by the State responded affirmatively to the questionnaire's inquiry whether "anyone close to you [has] ever been charged with, arrested for, or convicted of any public offense." We focus on

prospective juror 76, a Caucasian, and the only other prospective juror on whom the State conducted a SCOPE background check. In response to this question, prospective juror 36 answered, "Brother, not exactly sure of the charges." Similarly, the Caucasian juror answered, "My real father, but I don't know of what exactly . . . ." The Caucasian juror was only asked one question about this answer during voir dire—"Without getting too in depth into the questions that you had that were asked related to your father, I'm assuming there is nothing related to your father that would affect your ability to be fair and impartial." In contrast, prospective juror 36 was asked 18 questions about her answer, 3 by the defense and 15 by the State. Sometime after this questioning, the State entered both jurors' names into the SCOPE database as part of its independent investigation. Neither background check turned up information about the prospective jurors' family members. The African-American juror was struck, and the Caucasian juror remained on the empaneled jury. We are not persuaded that the State was seriously concerned about whether a juror's family member had been prosecuted by the State and whether they had been convicted of a violent crime, when it asked the Caucasian prospective juror a single leading question about her father. Disparate questioning by prosecutors of struck veniremembers and those veniremembers of another race or ethnicity is evidence of purposeful discrimination.

Having considered all the relevant circumstances, we conclude that the district court clearly erred by allowing the State to exercise a peremptory challenge to dismiss prospective juror 36. Because this error is structural, *Diomampo v. State*, 124 Nev. 414, 423, 185 P.3d 1031, 1037 (2008), we reverse the judgment of conviction and remand this matter to the district court for proceedings consistent with this opinion.

_____, J.
Cherry

We concur:

_____, C.J.
Parraguirre

_____, J.
Saitta

SUPREME COURT
OF
NEVADA

(O) 1947A

DOUGLAS, J., concurring:

I agree with the majority's conclusion that McCarty's Sixth Amendment right to counsel attached at his initial appearance before the magistrate and that he waived his right to counsel under the circumstances presented here. Further, I agree with the majority's decision to reverse the judgment of conviction and remand for a new trial based on *Batson* error. I write separately to highlight my concern over the district court's handling of McCarty's *Batson* objection.

Although the three-step *Batson* analysis is firmly rooted in our jurisprudence, we continue to see that analysis not being followed. McCarty challenged the State's peremptory strike against juror 36 as discriminatory and the State proffered race-neutral reasons to support the strike. However, the district court ignored step three of the analysis, which required it to "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" to determine whether McCarty met his burden of proving discriminatory intent. *Batson v. Kentucky*, 476 U.S. 79, 93 (1986) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see Hernandez v. New York*, 500 U.S. 362, 363 (1991); *Conner v. State*, 130 Nev., Adv. Op. 49, 327 P.3d 503, 509 (2014). That sensitive inquiry necessarily includes factual findings regarding discriminatory intent, *see Hernandez*, 500 U.S. at 364 (observing that the trial court's decision on the ultimate question of discriminatory intent represents a factual finding), and credibility determinations, not only concerning the prosecutor but the juror who is the subject of the *Batson* challenge, *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("[T]he trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also

SUPREME COURT
OF
NEVADA

(O) 1947A

the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor."). The district court plays a crucial role in evaluating a *Batson* claim, as we rely on those determinations to effectively review whether there has been purposeful discrimination. *See Kaczmarek v. State*, 120 Nev. 314, 334, 91 P.3d 16, 30 (2004) ("An adequate discussion of the district court's reasoning may be critical to our ability to assess the district court's resolution of any conflict in the evidence regarding pretext."); *see also Snyder*, 552 U.S. at 477 (acknowledging the trial court's "pivotal role in evaluating *Batson* claims"); *Hernandez*, 500 U.S. at 365 (observing that the trial court's findings concerning discriminatory intent "largely will turn on evaluation of credibility"' and therefore those findings are accorded great deference on appeal (quoting *Batson*, 476 U.S. at 98 n.21)).

Here, the district court articulated no factual or credibility findings regarding the State's proffered race-neutral reasons for striking juror 36. The record only reflects a lengthy discussion of the SCOPE searches and the prosecutor's use of the SCOPE database, not a discussion or analysis of any race-neutral reason for striking this juror. We therefore cannot make those determinations. That duty fell exclusively on the district court. Nor did the district court satisfy its obligation to determine whether McCarty had met his burden of showing purposeful discrimination. Consequently, the district court has left us in the dark. I acknowledge, as the majority does, that the pretext argument was not well developed in the district court. Nevertheless, this case aptly illustrates why it is crucial that the district court undertake a thoughtful and proper analysis, not only to adequately assess the merits of a *Batson* challenge at the trial level, but to allow this court to effectively evaluate a challenge on

appeal. A deficient *Batson* analysis is particularly troubling in capital prosecutions. When a defendant faces the ultimate punishment—a sentence of death—it is imperative to follow the letter of the law. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("We are satisfied that [the] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability."). The letter of the law was not followed here. Therefore, I would reverse the judgment of conviction based on the district court's failure to adhere to analysis mandated under *Batson*.

_____, J.
Douglas

SUPREME COURT
OF
NEVADA

(O) 1947A

PICKERING, J., with whom HARDESTY and GIBBONS, JJ., agree, concurring in part and dissenting in part:

The majority reverses McCarty's judgment of conviction based on its finding that the State engaged in purposeful racial discrimination, forbidden under *Batson v. Kentucky*, 476 U.S. 79 (1986), when it exercised a peremptory challenge against prospective juror 36, a 28-year-old, married, African-American woman. I cannot reconcile this finding with the record of proceedings in the district court, or controlling law. With the exception of part I of the opinion, in which I join, I therefore respectfully dissent.

*Batson* holds that the Equal Protection Clause of the Fourteenth Amendment forbids prosecutors from exercising peremptory challenges against prospective jurors based on their race. *Id.* at 89. Unlike for-cause challenges, which test a juror's objective impartiality, peremptory challenges "are often the subjects of instinct," *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (citing *Batson*, 476 U.S. at 106 (Marshall, J., concurring)), "based on subtle impressions and intangible factors," *Davis v. Ayala*, 576 U.S. ___, ___, 135 S. Ct. 2187, 2208 (2015), that are "inherently subjective." *Miller-El*, 545 U.S. at 266-67 (Breyer, J., concurring); *see also Hernandez v. New York*, 500 U.S. 352, 374 (1991) (O'Connor, J., concurring) (plurality opinion) ("Absent intentional discrimination violative of the Equal Protection Clause, parties should be free to exercise their peremptory strikes for any reason, or no reason at all. The peremptory challenge is, 'as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose.'" (quoting *Lewis v. United States*, 146 U.S. 370, 378 (1892))).

SUPREME COURT
OF
NEVADA

(O) 1947A

A case can be made for eliminating peremptory challenges altogether in criminal cases, *Batson*, 476 U.S. at 102-03 (Marshall, J., concurring) (stating that the only way to "end the racial discrimination that peremptories inject into the jury-selection process [is to] eliminat[e] peremptory challenges entirely"); *Miller-El*, 545 U.S. at 266-67 (Breyer, J., concurring) (to similar effect), but this has not occurred. Instead, case law leaves it to the district courts to ferret out discrimination in the exercise of peremptory challenges, a process that "places great responsibility in the hands of the trial judge, who is in the best position to determine whether a peremptory challenge is based on an impermissible factor." *Davis*, 576 U.S. at ___, 135 S. Ct. at 2208.

A *Batson* objection triggers a three-step analysis in the district court: "[(1)] a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; [(2)] the prosecution must offer a race-neutral basis for striking the juror in question; and [(3)] the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (internal quotation marks and alterations omitted); *accord Hawkins v. State*, 127 Nev. 575, 578, 256 P.3d 965, 967 (2011). Steps two and three require the district judge to "evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes." *Davis*, 576 U.S. at ___, 135 S. Ct. at 2201. Such "'determinations of credibility and demeanor lie peculiarly within a trial judge's province,'" and "'in the absence of exceptional circumstances, [a reviewing court will] defer to the trial court.'" *Id.* (quoting *Snyder*, 552 U.S. at 477); *see Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring) ("Appellate judges cannot on

Supreme Court
of
Nevada

(O) 1947A

2

the basis of a cold record easily second-guess a trial judge's decision about likely motivation."); *Watson v. State*, 130 Nev., Adv. Op. 76, 335 P.3d 157, 165-66 (2014) ("This court affords great deference to the district court's factual findings regarding whether the proponent of a strike has acted with discriminatory intent, *Diomampo v. State*, 124 Nev. 414, 422-23, 185 P.3d 1031, 1036-37 (2008), and we will not reverse the district court's decision 'unless clearly erroneous.'" (quoting *Kaczmarek v. State*, 120 Nev. 314, 334, 91 P.3d 16, 30 (2004))).

The majority acknowledges these rules but then does not follow them. Reversing the district court, it deems the race-neutral reasons the State gave for striking juror 36 pretextual and suggests that the district court gave the defense unfairly short shrift in adjudicating its *Batson* challenge. This holding attributes to the defense a claim of pretext it did not make and, I respectfully submit, misapprehends the record and how it evolved in district court.

Juror 36 divulged in her answers to the written jury questionnaire that her brother had been prosecuted by the Clark County District Attorney's Office—the same office prosecuting McCarty—and did time in prison as a result. She did not know the details, though the defense and the State both pressed her about them. At one point during the defense's questioning of her, for reasons not entirely clear, juror 36 started to cry. Neither side questioned her further, and both sides passed her for cause.

In preparing for its peremptory challenges, the State conducted a Shared Computer Operations for Protection and Enforcement or SCOPE search on juror 36 to try to find her maiden name and thereby identify her brother and the crime he was convicted of. Although the State

Supreme Court
of
Nevada

(O) 1947A

3

learned juror 36's maiden name, the name was too common for the State to identify her brother or his crime. But the State's research turned up a work card authorizing juror 36 to work at a Las Vegas strip club called "Sin." Though juror 36 had obtained the work card three years earlier, and was attending college, the card was current and would not expire for two more years. The State struck juror 36 and, when challenged by the defense, relied on the facts just summarized.

The majority suggests that the defense challenged the State's strip-club explanation as pretextual and that, when challenged, the State scrambled to come up with another reason for excusing juror 36: her brother's criminal history. This is not accurate. The defendant was charged with murdering two women he had been pandering as prostitutes and using to help him deal drugs. Given these alleged facts, not wanting a woman who worked or had recently worked at a strip club on the jury provided a facially race-neutral reason for the peremptory challenge. *See Felkner v. Jackson*, 562 U.S. 594, 595 (2011) (the trial court did not act unreasonably in deeming the prosecutor's explanation about not "lik[ing] to keep social workers" on a jury to be "race-neutral"); *Hawkins*, 127 Nev. at 579, 256 P.3d at 967 (holding to similar effect as to peremptory challenge of a college professor). Indeed, the defense did not argue otherwise in district court and, at two points in the argument, came very close to conceding that, in this particular case, striking a woman with a work card for a Las Vegas strip club from the jury was understandable. The brother's unexplained criminal history factored into the discussion as the reason for conducting the SCOPE search on juror 36 (and juror 76, see

below) and in that light is likewise understandable, not, as the majority suggests, a flimsy fallback.[1]

---

[1]The transcript is consistent with the account in the text. When challenged to provide a race-neutral reason for striking juror 36, the State gave the following account of its reasons:

> In our questionnaire, she indicated that her brother had been convicted by a—of a felony by our office. When I questioned her about it, you know, it was, [w]ell, he had picked up warrants, but I'm really not sure what for. She indicated that—I asked her if it was about a crime that [inaudible] which [inaudible] jurors on here with anybody [inaudible] for the prosecutor of the crime. She couldn't answer that question.

> Afterwards, [defense counsel] was asking her questions and apparently she had an answer to a question on the last section related to something [inaudible]—her feelings concerning the issue that—that's relevant there, and she did not put it on the questionnaire but indicated to [defense counsel] that something happened to her and she didn't want to tell him about it, and he didn't press her any further.

> Based on that, you know, I really want to know what her brother did, so I did a little research into her background, found out—I could not identify who her brother was, but during the course of researching her background, I found that that she has a current valid hard work card for a strip club, Judge. And so with all due respect, it was nothing to do with the race, but the State of Nevada's not going to leave somebody who works at a strip club on their panel. So . . . .

The State revealed that it had run a SCOPE search on juror 36 in explaining its reasons for striking her. This prompted the defense to object to its lack of access to SCOPE and similar law enforcement databases. When the defense suggested that the State may have run a SCOPE search on juror 36 in the hopes of unearthing a plausible race-neutral reason for excusing her, the district court did not, as Justice Douglas's concurrence argues, fail to examine and resolve the purposeful discrimination claim. On the contrary, the district judge directly questioned the two prosecutors representing the State about the SCOPE searches they or anyone working for them had run. The State's lawyers represented to the court that they ran the searches on two jurors, juror 36 and one other, juror 76, a Caucasian woman whose questionnaire answers resembled those of juror 36. (Juror 76's father did time in prison, but she could not say for what; she, too, was married, and the State searched SCOPE for her maiden name; unlike juror 36, the search did not turn up anything.) The prosecutors further confirmed that they did not run SCOPE searches on any other members of the venire, including, specifically, the three other African Americans remaining after the jury was passed for cause. The district court then stated, on the record, that it was "accepting Counsel at his word that the two people he looked up were [jurors 36 and 76]," and, after entertaining additional argument, denied the defense's motion to strike the jury panel. The district court heard, considered, and resolved the purposeful discrimination claim the defense made; it was not obligated to do more. *Compare Conner v. State*, 130 Nev., Adv. Op. 49, 327 P.3d 503, 509 (2014), *cert. denied*, ___ U.S. ___, 135 S. Ct. 2351 (2015) ("[T]he defendant bears a heavy burden in demonstrating that the State's facially race-neutral explanation is pretext for

SUPREME COURT
OF
NEVADA

6

discrimination."), *with Hawkins*, 127 Nev. at 579, 256 P.3d at 967 ("*Batson* does not impose 'an independent duty on the trial court to pore over the record and compare the characteristics of jurors, searching for evidence of pretext, absent any pretext argument or evidence presented by counsel.'" (quoting *Johnson v. Gibson*, 169 F.3d 1239, 1248 (10th Cir. 1999))).

The real focus of the defense's argument in the district court was on the inequity in the State having access to the SCOPE database when the defense did not. The voir dire and the appellate briefing in this case predated our decision in *Artiga-Morales v. State*, 130 Nev., Adv. Op. 77, 335 P.3d 179 (2014) (4-3), in which a divided en banc court rejected a challenge to the State's use of criminal databases such as SCOPE in preparing for voir dire. And here, the defense did not file the written pretrial motion that the defense did in *Artiga-Morales*, asking the district court to compel the State to produce SCOPE search results on the venire— a deficiency that led the district court in this case to state that the defense "almost in effect waived" the argument by not filing a written motion. Nonetheless, the district court *granted* the defense's oral motion to compel the State to share with the defense the results of the two SCOPE searches it ran on jurors 36 and 76. After the prosecutors again confirmed that these were the only SCOPE searches they or anyone acting for them ran on the venire, the defense then made a record that for the State to challenge jurors with incarcerated family members unfairly prejudices people of color, which argument is reiterated on appeal. The district court rejected the defense's *Batson* challenge, and the jury was sworn. Although the majority suggests otherwise, the district court did not cut the defense argument off on any of these issues. On the contrary, the transcript of proceedings on the defense's *Batson* challenge runs almost 50 pages, with

the district court excusing the jury and breaking early for lunch so the lawyers could undertake research over the noon hour, then reconvening outside the presence of the jury to argue the matter.

The opening and answering briefs on appeal recite the *Batson* standards but do little or no analysis of how they should apply to this record. It is only in the reply brief that the defense actually hints at the argument that striking juror 36 based on her strip club work card was pretextual, an argument the majority credits but the defense did not make in their opening brief or in district court. This is too little, too late. The burden is on the opponent of the strike to traverse the race-neutral reason(s) and demonstrate pretext. *E.g.*, *Kazmarek*, 120 Nev. at 333, 91 P.3d at 29 ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."); *Hawkins*, 127 Nev. at 579, 256 P.3d at 967 (rejecting *Batson* challenge where, as here, the defense did not make in district court the pretext argument advanced on appeal).

The district court handled the *Batson* challenge with care. It allowed the lawyers to make a record outside the presence of the jury and gave them time to undertake research on the issues they raised. The district judge witnessed juror 36's demeanor and that of the prosecutors who exercised a peremptory strike against her. He found no purposeful discrimination by the State's attorneys. On this record, that factual finding was not "clearly erroneous" and does not properly serve as a basis

to vacate the judgment on the jury's verdict and require a new trial in this case.

        I dissent.

_____, J.
Pickering

We concur:

_____, J.
Hardesty

_____, J.
Gibbons