## 136 Nev., Advance Opinion 1

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| NORMAN KEITH FLOWERS, A/K/A NORMAN HAROLD FLOWERS, III, Appellant, vs. THE STATE OF NEVADA, Respondent. | No. 53159 **FILED** JAN 3 0 2020 ELIZABETH A. BROWN CLERK OF SUPREME COURT BY_____ CHIEF DEPUTY CLERK |
| NORMAN HAROLD FLOWERS, III, Appellant, vs. THE STATE OF NEVADA, Respondent. | No. 55759 |

Consolidated appeals from a judgment of conviction and amended judgment of conviction, pursuant to a jury verdict, of burglary, first-degree murder, and sexual assault, and from an order denying a motion for a new trial. Eighth Judicial District Court, Clark County; Kathy A. Hardcastle, Senior Judge; Stewart L. Bell, Judge; Linda Marie Bell, Chief Judge.

*Affirmed.*

JoNell Thomas, Special Public Defender, and Randall H. Pike and Clark W. Patrick, Chief Deputy Special Public Defenders, Clark County, for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Pamela C. Weckerly and Charles W. Thoman, Chief Deputy District Attorneys, and Nancy A. Becker, Deputy District Attorney, Clark County, for Respondent.

20-04160

BEFORE PICKERING, C.J., PARRAGUIRRE and CADISH, JJ.

*OPINION*

By the Court, PICKERING, C.J.:

A Clark County jury convicted appellant Norman Flowers of first-degree felony murder, sexual assault, and burglary in connection with the rape and murder of 18-year-old Sheila Quarles. Flowers timely appealed his original and amended judgments of conviction and the order denying the motion for a new trial that followed. The appeals were consolidated, briefed, and argued. Before a decision was reached, we granted Flowers' motion to voluntarily dismiss these consolidated appeals due to a global plea agreement resolving the charges in this and a separate criminal case. Years later, Flowers succeeded in setting aside the plea agreement. This court subsequently granted Flowers' motion to reinstate these consolidated appeals. After supplemental briefing and reargument, we affirm.

## I. *FACTS*

At the time of her death, Sheila Quarles shared an apartment with her mother, Debra, in Las Vegas. On March 24, 2005, Sheila stayed home from her job at Starbucks while her mother went to work. Sheila spoke to her mother by phone several times that day, the last time at 1 p.m. Around 3 p.m., Debra returned to the apartment and found Sheila, face-up and nonresponsive, in a bathtub full of hot water. By the time paramedics arrived, Sheila had died.

There were no signs of a forced entry into the apartment. Some items in the bathroom had been knocked over and several valuables were missing, including Sheila's cell phone, her bankcard, and jewelry. Las Vegas Metropolitan Police Department (LVMPD) detectives noted that

SUPREME COURT
OF
NEVADA

(O) 1947A

Sheila had a bruised abdomen and scraped knee but saw no major external injuries.

The Clark County Coroner's Office performed an autopsy. The autopsy report was not admitted into evidence, but some of the photographs documenting it were. The autopsy revealed the following: Sheila had hemorrhages under her scalp, consistent with blunt force trauma to the head; she had suffered vaginal lacerations and tears, consistent with sexual assault; she exhibited petechiae, consistent with asphyxiation; she had hemorrhages on her neck, consistent with manual strangulation; and her lungs contained froth, consistent with drowning. The lack of swelling in the vaginal lacerations and tears indicated that the sexual assault occurred less than an hour before Sheila died.

LVMPD collected a vaginal swab from Sheila's body at the autopsy and her thong underwear from the crime scene. The crime lab found sperm in both. A forensic scientist in LVMPD's biology/DNA unit, Kristina Paulette, generated DNA profiles from this evidence. The profiles revealed a mixture of Sheila's DNA and that of two unknown males. LVMPD used the DNA profiles to eliminate several possible suspects. The profiles did not initially provide any new leads, though, and the case went cold.

Less than two months after Sheila's death, on May 3, 2005, a second woman, Merilee Coote, was found dead in her Las Vegas apartment, the victim of sexual assault and manual strangulation. The crime scene yielded single-source DNA profiles from the carpet underneath Coote's body and from her vaginal and anal swabs. Flowers and Coote knew one another through a woman Flowers had dated, and a witness placed Flowers in Coote's apartment complex at the time Coote's body was found. As part of

SUPREME COURT
OF
NEVADA

(O) 1947A

3

the Coote investigation, LVMPD obtained a buccal swab from Flowers. Flowers' DNA profile matched the DNA profile generated from the Coote crime scene, and Flowers was arrested for the Coote sexual assault and murder.

Paulette entered the DNA profiles generated from Sheila's crime scene evidence into CODIS, a DNA database. After receiving Flowers' DNA profile—generated in connection with the investigation into the Coote murder—CODIS alerted Paulette that it had identified Flowers as a potential contributor to the Sheila Quarles DNA profiles. Paulette reworked Flowers' buccal swab and confirmed that, unlike 99.9% of the population, Flowers could not be excluded as one of the two males who contributed to the mixed DNA profiles from Sheila's crime scene.

This new information led detectives to focus on Flowers as a person of interest in Sheila's sexual assault and death. Their investigation revealed that Flowers had dated Sheila's mother, Debra, for several months in late 2004 and met Sheila then. Two weeks before Sheila died, Flowers approached Debra and Sheila, who were sitting outside their apartment. Asked why he was there, Flowers replied that he'd been hired to do maintenance work at the apartment complex. The three spoke for approximately 20 minutes. At trial, the property manager testified that Flowers never worked at the complex. After Sheila's death but before Flowers' arrest in the Coote case, Flowers expressed his sympathy to Debra for Sheila's death, drove her to two grief counseling sessions, and asked Debra for updates on the investigation into Sheila's case.

Eventually, LVMPD identified George Brass as the second contributor to the DNA mix from Sheila's crime scene. Sheila had a casual sexual relationship with Brass, who lived with his mother at the same

apartment complex as Sheila and her mother. When interviewed, Brass stated that he had consensual sex with Sheila the morning of the day she died, then drove across town to the Wal-Mart where he worked. Wal-Mart records showed that Brass clocked in at noon, left for lunch at 4 p.m., returned to work at 5 p.m., and left for the day at 7:45 p.m.

In the Sheila Quarles matter, the State charged Flowers with one count each of first-degree murder, sexual assault, burglary, and robbery, and filed a notice of intent to seek the death penalty. The State brought similar charges against Flowers in connection with Merilee Coote's death and sexual assault and the death and sexual assault of a third woman, Rena Gonzalez. The district court denied the State's motion to consolidate Sheila's case with the Coote/Gonzalez case. After an evidentiary hearing, however, the district court granted in part and denied in part the State's motion to introduce evidence relating to Coote's death and sexual assault to establish that Flowers, not Brass or someone else, killed Sheila and to refute Flowers' claim that he had consensual sex with Sheila.

Flowers proceeded to trial in the Sheila Quarles case in October 2008. The jury found Flowers guilty of first-degree murder on a felony-murder theory, sexual assault, and burglary. It found Flowers not guilty of robbery and declined to impose the death penalty, instead returning a verdict of life without the possibility of parole. The district court denied Flowers' motions for a new trial.

## II. *TRIAL ISSUES*

Flowers raises eight issues respecting the trial in his case. He urges reversal because the district court (A) erred in admitting evidence related to the Coote sexual assault and murder; (B) accepted testimonial hearsay, violating the Confrontation Clause; (C) admitted the uncounseled

statement Flowers gave police about Sheila after being charged and appointed counsel in the Coote case, violating his Fifth and Sixth Amendment rights; (D) unconstitutionally allowed the admission of gruesome autopsy photographs; (E) denied Flowers' constitutional rights by excluding as hearsay an exculpatory statement Sheila made to a third party about having a relationship with "Keith" (the name Flowers went by); and (F) tolerated prosecutorial misconduct; and because the conviction is (G) not supported by sufficient evidence and (H) tainted by cumulative error.

### A. *Evidence of the Coote sexual assault and murder*

Flowers argues that the district court erred and violated his constitutional rights when it allowed the State to present evidence of the Coote sexual assault and murder to prove that Flowers, not Brass or someone else, sexually assaulted and killed Sheila. He sees the crimes as too dissimilar to give the Coote evidence enough nonpropensity probative value to outweigh its undeniably prejudicial effect.

NRS 48.045(2) prohibits the use of "[e]vidence of other crimes, wrongs or acts . . . to prove the character of a person in order to show that the person acted in conformity therewith." Evidence of a defendant's other bad acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*; *see Bigpond v. State*, 128 Nev. 108, 116, 270 P.3d 1244, 1249 (2012) (holding that NRS 48.045(2)'s list of permissible nonpropensity purposes is not exclusive). "A presumption of inadmissibility attaches to [other] bad act evidence." *Ledbetter v. State*, 122 Nev. 252, 259, 129 P.3d 671, 677 (2006) (quotation omitted). Before admitting other-bad-act evidence, the district court must determine, outside the presence of the jury, that (1) the other bad act is relevant to the crime charged, (2) the State can prove the other bad act by clear and convincing

SUPREME COURT
OF
NEVADA


(O) 1947A

evidence, and (3) the nonpropensity probative value of the other-bad-act evidence "is not substantially outweighed by the danger of unfair prejudice." *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997), *modified by Bigpond*, 128 Nev. 108, 270 P.3d 1244; *see Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985), *superseded in part by statute as stated in Thomas v. State*, 120 Nev. 37, 44-45, 83 P.3d 818, 823 (2004). "This court reviews a district court's decision to admit or exclude [other]-bad-act evidence under an abuse of discretion standard," *Newman v. State*, 129 Nev. 222, 231, 298 P.3d 1171, 1178 (2013), and will not reverse except on "a showing that the decision is manifestly incorrect." *Rhymes v. State*, 121 Nev. 17, 21-22, 107 P.3d 1278, 1281 (2005).

The district court held the hearing and supportably made the findings that *Tinch* and *Petrocelli* required to overcome the presumption against admitting other-bad-act evidence.[1] The district court deemed the Coote crime relevant to identity and intent because it was close in time and distinctively similar to the Sheila Quarles crime. Important to the district court: Both Coote and Sheila were sexually assaulted and manually strangled in their Las Vegas apartments, less than two months apart; both women knew Flowers, having met him through women he'd dated; and DNA

---

[1]NRS 48.045(3) provides: "Nothing in this section shall be construed to prohibit the admission of evidence in a criminal prosecution for a sexual offense that a person committed another crime, wrong or act that constitutes a separate sexual offense." We do not address this provision because it was added to NRS 48.045 in 2015, after the trial in this case, and so the district court did not consider it. 2015 Nev. Stat., ch. 399, § 21, at 2243; *see Franks v. State*, 135 Nev. 1, 3-4, 432 P.3d 752, 755 (2019) (noting "that NRS 48.045(3) unambiguously permits the district court to admit prior sexual bad acts for propensity purposes in a criminal prosecution for a sexual offense" and applying the statute to a criminal case filed before but tried after its October 1, 2015, effective date).

evidence directly implicated Flowers in both cases. These facts, the district court held, tended to show that Flowers, not Brass or someone else, sexually assaulted and killed both women. The district court also found the State could prove the Coote assault and murder by clear and convincing evidence and that the undeniably prejudicial effect of the Coote evidence did not substantially outweigh its probative value.

The jury had to decide who raped and killed Sheila. The identity exception in NRS 48.045(2) applies "where a positive identification of the perpetrator has not been made, and the offered evidence establishes a signature crime so clear as to establish the identity of the person on trial." *Rosky v. State*, 121 Nev. 184, 196-97, 111 P.3d 690, 698 (2005) (quoting *Mortensen v. State*, 115 Nev. 273, 280, 986 P.2d 1105, 1110 (1999)). The DNA from Coote's crime scene solely identified Flowers, while the DNA from Sheila's was mixed. Both victims were African-American. Both were manually strangled, as their internal neck hemorrhages confirmed. The vaginal lacerations and tears each suffered were similar. Both women knew Flowers; both were killed during the day at home in their Las Vegas apartments with no sign of forced entry into the apartment. Several items of personal property were taken from both victims' apartments, which were otherwise left undisturbed. The perpetrator used hot water at both crime scenes to destroy evidence. Though Flowers argues otherwise, these similarities are distinctive and go beyond commonplace evidence in sexual assault/murder cases. We recognize there were dissimilarities, too: Sheila was 18 years old while Coote was 45; Sheila was vaginally penetrated while Coote sustained both vaginal and anal penetrations; and Sheila's body was found in the bathtub, drowned, while Coote's body was found in the living room with burns in her pubic area. Despite these dissimilarities, the

SUPREME COURT
OF
NEVADA

(O) 1947A

8

similarities do not allow us to say the district court abused its considerable discretion or was manifestly wrong when it deemed the Coote evidence relevant to identity.

The district court also permissibly deemed the Coote assault and murder relevant to intent. Flowers suggested that he had consensual sex with Sheila. Because the two crimes were similar, and because the State found only Flowers' DNA at the Coote crime scene, the Coote assault tended to show that the presence of Flowers' DNA in Sheila meant that he sexually assaulted her too. It seems unlikely that Flowers happened to have consensual sex with two women who each shortly thereafter was sexually assaulted, strangled, and killed by unknown assailant(s). These facts dispositively distinguish *Hubbard v. State*, 134 Nev. 450, 422 P.3d 1260 (2018), on which Flowers relies, where the defendant denied being present at the crime scene and no physical evidence tied him to it.

As noted, the district court found that the State presented clear and convincing evidence of the Coote assault and murder. It weighed the evidence's probative value against its prejudicial effect and gave proper limiting instructions. The district court did not err in admitting the Coote evidence to prove identity and intent. *See Diomampo v. State*, 124 Nev. 414, 429-30, 185 P.3d 1031, 1041 (2008) ("[T]he trial court's determination to admit or exclude evidence of prior bad acts is a decision within its discretionary authority and is to be given great deference.") (quotation omitted).

Flowers makes two additional arguments respecting the Coote evidence. First, he argues the State exceeded certain limits the district court placed on the admission of this evidence. Because Flowers did not object when the State assertedly violated the order in limine, *see BMW v.*

SUPREME COURT
OF
NEVADA

(O) 1947A

9

*Roth*, 127 Nev. 122, 135, 252 P.3d 649, 658 (2011) (requiring contemporaneous objection to violation of order in limine), we review for plain error, *see Thompson v. State*, 125 Nev. 807, 816 n.7, 221 P.3d 708, 714 n.7 (2009), and find none. Second, Flowers raises "a very narrow [constitutional] question: 'whether admission of . . . evidence that is both relevant . . . and not overly prejudicial . . . may still be said to violate the defendant's due process right to a fundamentally fair trial.'" *United States v. LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001) (quoting *United States v. Castillo*, 140 F.3d 874, 882 (10th Cir. 1998)). "[T]o ask the question is to answer it [in the negative]." *Id.* (quoting *Castillo*, 140 F.3d at 882). The Coote sexual assault and murder were relevant to Sheila's sexual assault and murder and admitting this evidence did not violate Flowers' due process right to a fair trial.

### B. *Confrontation Clause errors*

Flowers contends that his constitutional right to confront the witnesses against him was violated during the testimony of Dr. Larry Simms from the Clark County Coroner's Office and Kristina Paulette, a forensic scientist with LVMPD's biology/DNA unit. He argues that Simms and Paulette relied on testimonial out-of-court statements from others in their respective offices whom the State did not call as witnesses, and that this violated *Crawford v. Washington*, 541 U.S. 36 (2004). The Confrontation Clause guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, the high court held that this guarantee bars the admission of testimonial hearsay unless (1) the declarant is unavailable and the accused either (2) had a prior opportunity to cross-examine the declarant or (3) forfeited his or her right to object by

SUPREME COURT
OF
NEVADA

(O) 1947A

10

wrongdoing. 541 U.S. at 54, 62; *see People v. Garton*, 412 P.3d 315, 331 (Cal.), *cert. denied by Garton v. California*, ___ U.S. ___, 139 S. Ct. 417 (2018).

Flowers did not raise a Confrontation Clause objection to Simms's or Paulette's testimony at trial. The Supreme Court has recognized that "[t]he right to confrontation may, of course, be waived, *including by failure to object to the offending evidence*, and States may adopt procedural rules governing the exercise of such objections." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14 n.3 (2009) (emphasis added). But in *Vega v. State*, 126 Nev. 332, 338, 236 P.3d 632, 636 (2010), we extended plain error review to an otherwise forfeited Confrontation Clause objection.

Plain error review is discretionary, not obligatory. *Jeremias v. State*, 134 Nev. 46, 52, 412 P.3d 43, 49, *cert. denied*, ___ U.S. ___, 139 S. Ct. 415 (2018). To establish plain error, "an appellant must demonstrate that: (1) there was an 'error'; (2) the error is 'plain,' meaning that it is clear under current law from a casual inspection of the record; and (3) the error affected the defendant's substantial rights." *Id.* at 50, 412 P.3d at 48. A reviewing court determines "[w]hether an error is 'plain' . . . by reference to the law as of the time of appeal" and "typically will not find such error where the operative legal question is unsettled." *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001), *cited approvingly in Gaxiola v. State*, 121 Nev. 638, 648, 119 P.3d 1225, 1232 (2005). A plain error does not affect a defendant's substantial rights unless "it causes actual prejudice or a miscarriage of justice." *Jeremias*, 134 Nev. at 51, 412 P.3d at 49.

### 1. *The Simms testimony*

The State presented evidence about Sheila's and Coote's autopsies through the testimony of Larry Simms. Simms did not perform

SUPREME COURT
OF
NEVADA

(O) 1947A

the autopsies or author the autopsy reports on either woman; another forensic pathologist, Ronald Knoblock, did. Simms and Knoblock worked together at the Clark County Coroner's Office until Knoblock left to take another job, shortly after conducting Sheila's and Coote's autopsies. Nothing in the record suggests Knoblock was unavailable at time of trial.

Simms testified as an expert forensic pathologist. He offered opinion testimony based on his training and experience, his examination of the extensive photographs documenting the autopsies, and his review of the autopsy reports. Some but not all of the photographs were admitted into evidence; the autopsy reports were not. Much like the substitute coroner testimony considered in *Garton*, 412 P.3d at 331-32, Simms's testimony fell into three general categories: (1) testimony premised explicitly on the autopsy photographs, (2) testimony relating to statements Knoblock made in the autopsy reports, and (3) testimony expressing Simms's opinions based on his review of the photographs and autopsy reports.

Photographs are not statements, let alone testimonial out-of-court statements, so no arguable Confrontation Clause violation occurred as to Simms's category-one testimony. *Id.* at 331 ("It is clear that the admission of autopsy *photographs*, and competent testimony based on such photographs, does not violate the confrontation clause" because photographs are not out-of-court testimonial statements.) (quoting *People v. Leon*, 352 P.3d 289, 314 (Cal. 2015)); *see Jeremias*, 134 Nev. at 54, 412 P.3d at 51 (finding no Confrontation Clause violation "because the substitute coroner testified about independent conclusions she made based on photographs from the victims' autopsies").

Simms's category-three testimony also did not offend the Confrontation Clause. An expert witness may rely on hearsay, including

testimonial hearsay, without violating the Confrontation Clause, so long as the testifying expert does not "effectively" introduce the un-cross-examined testimonial hearsay into evidence. *Vega*, 126 Nev. at 340, 236 P.3d at 638. To the extent Simms offered his independent opinions and only conveyed to the jury that he generally relied on the autopsy photographs and reports in reaching his opinions, he did not communicate hearsay to the jury. *See Garton*, 412 P.3d at 332 (finding no Confrontation Clause violation to the extent the substitute coroner made clear she "was exercising her own independent judgment to arrive at her own conclusions" and "only conveyed to the jury in general terms that [she] relied on the autopsy report" without directly presenting statements from the autopsy reports).

Simms's category-two testimony is more problematic. Since the record does not include the autopsy reports, we cannot determine when Simms directly quoted Knoblock, except in a few places where the questions asked and answers given make clear that Simms is quoting from the autopsy report ("Q: As Dr. Knoblock performed this autopsy, did he form an opinion as to the cause of death of Sheila Quarles? A: Yes. Q: What was that opinion? A: Drowning. Q: Did he find anything else to be a contributing factor? A: Yes. Q: What was that? A: Strangulation.").

The State emphasizes that the coroner's office conducts autopsies and prepares autopsy reports pursuant to statutory mandate in a variety of deaths, not just deaths that lead to murder charges and court trials. It argues that, as business records of a public agency, autopsy reports do not constitute testimonial hearsay, so even this testimony did not offend the Confrontation Clause. *See Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011) ("A document created *solely* for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial.") (emphasis added)

SUPREME COURT
OF
NEVADA

(O) 1947A

(quoting *Melendez-Diaz*, 557 U.S. at 311). This court has not decided "whether autopsy reports constitute 'testimonial evidence' so as to trigger the protections of the Confrontation Clause," and courts elsewhere "have been almost evenly divided in their opinions" on this issue. Kimberly J. Winbush, *Application of Crawford Confrontation Clause Rule to Autopsy Testimony and Related Documents*, 18 A.L.R. 7th Art. 6 (2017) (collecting cases). The unsettled state of the law prevents us from saying the error, if any, in allowing the category-two Simms testimony, was "plain." *See Gaxiola*, 121 Nev. at 648, 119 P.3d at 1232 ("For an error to be plain, it must, 'at a minimum,' be 'clear under current law.'") (quoting *Weintraub*, 273 F.3d at 152 (quotation omitted)). Nor can we say, at least as to the testimony quoted above concerning the cause and manner of Sheila's death, that the testimony caused "actual prejudice or a miscarriage of justice." *Jeremias*, 134 Nev. at 51, 412 P.3d at 49. The testimony was cumulative; indeed, the defense acknowledged as much when it stated on the record that, "We're not challenging the cause of death." Flowers' Confrontation Clause challenge to Simms's testimony therefore fails.

### 2. *The Paulette testimony*

Kristina Paulette testified about the DNA testing done on Sheila's and Coote's crime scene evidence. Paulette performed all DNA testing done on Sheila's crime scene samples. A colleague of Paulette's in LVMPD's biology/DNA unit, Thomas Wahl, performed the DNA testing on the Coote samples and Flowers' buccal swab. When CODIS flagged the possible match between Flowers and one of the unidentified males from Sheila's crime, Paulette reworked the Flowers swab to independently confirm the reported hit. Paulette also retested the carpet from the Coote crime scene and verified the semen on it came from Flowers. Paulette did

SUPREME COURT
OF
NEVADA

(O) 1947A

14

not retest Coote's vaginal and anal swabs, instead relying on Wahl's work. The question presented is whether, to the extent Paulette's testimony relied on Wahl's testing of Coote's vaginal and anal swabs, this violated Flowers' Confrontation Clause rights.

As noted, Flowers did not assert a Confrontation Clause objection to either Simms's or Paulette's testimony. But when the State's questioning of Paulette turned to her opinions about Wahl's work, the defense interposed a hearsay objection. At that point, defense counsel took Paulette on voir dire and proceeded to establish that Wahl's DNA work qualified as a business record, taking it outside the hearsay rule. After completing this brief voir dire, the defense did not reassert the hearsay objection, so the court did not rule on it. Later, the defense DNA expert, George Schiro, relied on Paulette's testimony, including her testimony about Wahl's work, as foundational. ("Q: In your review of the data provided by the [LVMDP], you don't have any dispute that their method of extracting DNA and generating a DNA profile from a particular sample is scientifically valid? A: I have no problem with their work.")

For cases tried pre-*Crawford*, a hearsay objection sometimes sufficed to preserve a Confrontation Clause objection. *Dias v. State*, 95 Nev. 710, 714, 601 P.2d 706, 709 (1979). But post-*Crawford*, a Confrontation Clause challenge asks whether the out-of-court statement is "testimonial," raising a "threshold question" that an ordinary hearsay objection doesn't broach. *See Vega*, 126 Nev. at 339, 236 P.3d at 637. Thus, post-*Crawford*, a "defendant must object on the grounds that admission of the out-of-court statement will violate the defendant's right to confront witnesses; it is not sufficient to object to the statements as inadmissible hearsay." *Delhall v. State*, 95 So. 3d 134, 159 (Fla. 2012). Flowers' trial post-dated *Crawford* by

 

four years. Flowers' seemingly abandoned hearsay objection did not preserve the Confrontation Clause argument he presents on appeal, so plain error review applies.

Reviewed for plain error, Paulette's testimony about the DNA profiles Wahl generated from Coote's vaginal and anal swabs did not violate the Confrontation Clause. Whether a forensic scientist's testimony about a DNA profile a colleague generated is "testimonial" splintered the Supreme Court in *Williams v. Illinois*, 567 U.S. 50 (2012) (4-1-4 decision). And, like the law respecting autopsy reports, the question remains unresolved. *See* Kimberly J. Winbush, *Application of Crawford Confrontation Clause Rule to DNA Analysis and Related Documents*, 17 A.L.R. 7th Art. 3 (2016) ("Courts have been almost evenly divided in their opinions as to whether DNA reports—showing the DNA profiles of samples taken from the crime scene and/or whether those profiles match that of the criminal defendant—constitute 'testimonial evidence' so as to trigger the protections of the Confrontation Clause."). An error is not plain when the law is this unsettled.

Paulette retested both the carpet sample from beneath Coote's body and Flowers' buccal swab, replicating the DNA match Wahl's testing produced. Paulette's testimony about the Coote vaginal and anal swab profiles thus was cumulative and did not affect Flowers' substantial rights. A Confrontation Clause objection to the swab test results would not change the DNA profile evidence tying Flowers to the Coote sexual assault and murder and would likely have brought Wahl to testify in greater detail than Paulette did about them. *Cf. Jeremias*, 134 Nev. at 52, 412 P.3d at 50 (declining plain error review where the defendant's "failure to object could

Supreme Court
of
Nevada

(O) 1947A

reasonably be construed as intentional"). Flowers' Confrontation Clause challenge to Paulette's testimony fails plain error review.

### C. *Flowers' police interview*

LVMPD detective George Sherwood interviewed Flowers in August 2006. By then, Flowers had been arrested, charged, and had counsel appointed to represent him in the Coote case. Before interviewing Flowers, Sherwood read him the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The detective told Flowers he did not want to discuss Coote but had questions about another case LVMPD was investigating. The interview proceeded after Flowers read and signed a written *Miranda* waiver.

The district court overruled Flowers' objection that admission of the uncounseled interview violated his Fifth and Sixth Amendment rights. The part of the interview transcript that Sherwood read into the record at trial shows that Flowers became evasive when Sherwood tried to ask him about Debra and Sheila Quarles, but then acknowledged having known Sheila by her nickname, "Pooka." After that, Flowers shuts down, stating, "I got my own problems to deal with so I don't want to get involved in anybody else's matters." On cross-examination, defense counsel attempted to introduce a later portion of the transcript, suggesting Flowers might answer more questions but wanted to talk to his attorney first. The State objected and, after conferring with counsel at sidebar, the district court sustained the State's objection, explaining it did so to protect Flowers because him asking to speak to an attorney would suggest to the jury he had something to hide.

Sherwood's interview of Flowers did not violate his Fifth and Sixth Amendment right to counsel. "The Sixth Amendment right . . . is offense specific. . . . [I]t does not attach until a prosecution is commenced."

SUPREME COURT
OF
NEVADA

(O) 1947A

17

*McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). When Sherwood interviewed Flowers, the State had not charged Flowers in Sheila's case, so his Sixth Amendment right to counsel had not attached. True, Flowers had been charged and appointed counsel in the Coote case. But "a defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." *Texas v. Cobb*, 532 U.S. 162, 168 (2001); *accord Kaczmarek v. State*, 120 Nev. 314, 327, 91 P.3d 16, 25 (2004) ("the offense-specific Sixth Amendment right does not require suppression of statements deliberately elicited during a criminal investigation merely because the right has attached and been invoked in an unrelated case"). As for Flowers' Fifth Amendment rights, the Miranda warnings he received and waived fully apprised him of his rights against compulsory self-incrimination and to consult an attorney. "[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *accord McCarty v. State*, 132 Nev. 218, 224, 371 P.3d 1002, 1006 (2016).

Flowers presses us to make an exception to the *McNeil* rule when "an interrogation on a second case for which the defendant has not been charged, but for which it is easily foreseeable, that a conviction in the second case would serve as an aggravating circumstance in the first case for which the defendant has been charged." This exception would contradict *McNeil*, *Kaczmarek*, and *Cobb*, which emphatically declare the Sixth Amendment right to counsel "offense specific." *See Cobb*, 532 U.S. at 164 ("We hold that our decision in *McNeil* . . . meant what it said, and that the Sixth Amendment right [to counsel] is 'offense specific.'"); *Kaczmarek*, 120

SUPREME COURT
OF
NEVADA

(O) 1947A

18

Nev. at 327, 91 P.3d at 25. "Offense," for purposes of the Sixth Amendment "offense specific" right to counsel, means the same thing as "offense" does for purposes of the Fifth Amendment's Double Jeopardy Clause, forbidding putting a person in jeopardy twice for the "same offence," and is determined by *Blockburger v. United States*, 284 U.S. 299 (1932). *Cobb*, 532 U.S. at 173. Under *Blockburger*, 284 U.S. at 304, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Under this test, Coote's sexual assault and murder do not arguably constitute the same offense. That Flowers' conviction of Sheila's murder could constitute an aggravating factor in a jury's penalty determination in Coote's case—and vice versa—does not turn the charges in the two cases into the same offense.[2]

Flowers also raises as an issue on appeal the district court's ruling that prevented defense counsel from introducing Flowers' statement that he might answer more questions if he talked to his attorney. Whether sound or not, the strategy was for the defense, not the State or the court, to decide. We agree with Flowers that, as a matter of evidence, this ruling was error. NRS 47.120(1) ("When any part of a writing or recorded statement is introduced by a party, the party may be required at that time to introduce any other part of it which is relevant to the part introduced, and any party may introduce any other relevant parts."); *see Domingues v. State*, 112 Nev. 683, 693-94, 917 P.2d 1364, 1372 (1996). Even crediting Flowers' argument

---

[2]The record does not include the notice of intent to seek the death penalty in Coote's case. According to Flowers' opening brief, it was filed on November 8, 2005, more than nine months before the CODIS match led Sherwood to interview Flowers in connection with Sheila's case. The notice's reported reference to more than one murder conviction as an aggravator, *see* NRS 200.033(12), thus appears to have been referring to the Coote and Gonzalez deaths, not to Sheila's.

SUPREME COURT
OF
NEVADA

(O) 1947A

that the evidentiary error had a constitutional dimension, *see Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), it was harmless given its scant probative value and the other evidence of guilt, including DNA, Flowers' acquaintance with Sheila and her mother, and evidence of the Coote murder. *See* NRS 178.598; *Domingues*, 112 Nev. at 694, 917 P.2d at 1372.

### D. *Autopsy photographs*

Flowers asserts that the district court abused its discretion and violated his due process right to a fair trial by unnecessarily admitting gruesome photographs from Sheila's autopsy. "[E]vidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035(1); *see Harris v. State*, 134 Nev. 877, 880, 432 P.3d 207, 211 (2018) ("NRS 48.035 requires the district court to act as a gatekeeper by assessing the need for the evidence on a case-by-case basis and excluding it when the benefit it adds is substantially outweighed by the unfair harm it might cause."), *cert. denied*, ___ U.S. ___, 139 S. Ct. 2671 (2019).

The State admitted the autopsy photographs through the testimony of Larry Simms from the Clark County Coroner's Office. Simms testified that he reviewed several hundred photographs taken during Sheila's and Coote's autopsies and culled from them those he needed to illustrate his testimony—sixteen photographs from Sheila's autopsy and thirteen from Coote's. Unfortunately, the district court handled part of Flowers' objections at sidebar, so we do not have a record of the specific photographs Flowers objected to and the reasons given, if any, by the court for admitting them. Simms's testimony walks through the photographs and supports that they were chosen to illustrate the similarities between the injuries the two women's autopsies revealed: He showed them to the jury

 

when explaining how each suffered vaginal lacerations and tears, consistent with sexual assault; petechiae consistent with asphyxiation; and hemorrhaging to the front, sides, and back of their necks, consistent with manual strangulation.

"[D]espite gruesomeness, photographs of a victim's injuries are typically admissible in a criminal case. . . . [T]he State is usually entitled to present its case in the manner it believes will be most effective." *Harris*, 134 Nev. at 882, 432 P.3d at 212. With one or two possible exceptions, the photographs in this case—unlike the photographs in *Harris*—had clear probative value to establish that Sheila's and Coote's injuries were so similar the same person—Flowers, whose DNA was found at both crime scenes—likely assaulted and killed both. On this record, we cannot say that the "photographs' probative value was substantially outweighed by the danger of unfair prejudice [such that] the district court abused its discretion by admitting them." *Id.*; *see also Thomas*, 120 Nev. at 43 n.4, 83 P.3d at 822 n.4 ("Appellant has the ultimate responsibility to provide this court with 'portions of the record essential to determination of issues raised in appellant's appeal.'") (quoting NRAP 30(b)(3)).

### E. *Admissibility of hearsay*

To explain the presence of his DNA at the crime scene, Flowers sought to introduce testimony from William Kinsey, a boyfriend of Sheila's, that Sheila told him that she had a sexual relationship with "Keith" (Flowers' middle name and the name he went by). Flowers made an offer of proof outside the presence of the jury. Kinsey was incarcerated from December 2004 until Sheila's death in March 2005, did not know Flowers, and had never seen Flowers and Sheila together. All he could testify to was that Sheila visited him in jail and told him that she had a sexual

SUPREME COURT
OF
NEVADA

(O) 1947A

21

relationship with "Keith." After hearing argument, the district court sustained the State's hearsay objection and rejected Flowers' argument that Sheila's statement to Kinsey constituted a statement against interest, admissible under NRS 51.345. On appeal, Flowers makes a different argument—that the district court's refusal to allow this hearsay testimony rose to the level of a constitutional violation, citing *Chambers*, 410 U.S. 284.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302. However, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.*; *see also Rimer v. State*, 131 Nev. 307, 328, 351 P.3d 697, 712 (2015). "[P]erhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay." *Chambers*, 410 U.S. at 302; *see* NRS 51.035 (defining hearsay, generally, as an out-of-court "statement offered in evidence to prove the truth of the matter asserted"); NRS 51.065 (providing that hearsay statements are generally inadmissible unless an exception applies). However, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302; *accord Coleman v. State*, 130 Nev. 229, 239-42, 321 P.3d 901, 908-11 (2014).

*Chambers*—a fact-intensive case, *see id.* at 303 ("[W]e hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.")—is distinguishable. Chambers' defense focused on an individual, McDonald, who confessed (but later recanted that confession) to the crime for which Chambers was tried. *Id.* at 287-90. Chambers called McDonald as a witness, but due to an

SUPREME COURT
OF
NEVADA

22

(O) 1947A

antiquated state rule prohibiting a defendant from impeaching his own witnesses, Chambers was unable to effectively cross-examine McDonald about his confession. *Id.* at 291-92. Chambers found three witnesses prepared to testify that McDonald confessed to each of them (on separate, independent occasions). *Id.* at 292-93. Other evidence corroborated these hearsay statements. *Id.* at 300. Under this constellation of facts, Mississippi denied Chambers his right to a fair trial by not allowing the three witnesses to testify. *Id.* at 302-03.

The State did not similarly deny Flowers a fair trial. At issue in *Chambers* were confessions directly exculpating Chambers; at issue here was a far-less-exculpating statement that Sheila told Kinsey she had a sexual relationship with "Keith." Perhaps evidence of a sexual relationship would have suggested it was more likely that Flowers had consensual sex with Sheila the day she died, but it was not determinative of consent that day. In *Chambers*, three witnesses were prepared to testify, and other evidence corroborated their testimony. Here, Kinsey's testimony was ambiguous and entirely uncorroborated, with no assurance of trustworthiness. Chambers had no opportunity to fully and effectively cross-examine McDonald (due to state law); Flowers had a full opportunity to cross-examine the witnesses against him. McDonald, the hearsay declarant in *Chambers*, was present at trial and *could* have been questioned about the hearsay in the absence of the state law rule; Sheila, the hearsay declarant here, was the victim and was therefore unavailable for testimony. Moreover, in *Chambers*, the confessions fit squarely within a widely recognized category of admissible hearsay, declarations against interest, a robust "exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made." *Id.*

SUPREME COURT
OF
NEVADA

(O) 1947A

23

at 299. Flowers does not identify any similar exception to the hearsay rule that would apply. Thus, unlike the trial court in *Chambers*, the district court here did not deny Flowers a fair trial by invoking Nevada hearsay rules to exclude the testimony.

### F. *Prosecutorial misconduct*

Flowers argues that the State committed two instances of prosecutorial misconduct.

First, Flowers argues that the State engaged in prosecutorial misconduct during closing argument by commenting on his post-*Miranda* silence. But the district court correctly overruled Flowers' objection to the State's comments because Flowers had knowingly and voluntarily waived his rights at the time of the referenced questioning. *See Davis v. United States*, 512 U.S. 452, 458 (1994) ("If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him."); *see also McNeil*, 501 U.S. at 178 (noting the probative value of evasive conduct following a *Miranda* waiver because "suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions").

Second, Flowers argues, for the first time on appeal, that the State improperly commented on his decision not to testify in his defense. Because Flowers did not object to this assigned error at trial, we review for plain error, *see Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008), and find none. The prosecutor's comments focused on Brass's testimony and only indirectly insinuated that Flowers had "something to hide." "[A]n indirect comment violates the defendant's Fifth Amendment right against self-incrimination only if the comment 'was manifestly

 

intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify.'" *Taylor v. State*, 132 Nev. 309, 325, 371 P.3d 1036, 1047 (2016) (quoting *Harkness v. State*, 107 Nev. 800, 803, 820 P.2d 759, 761 (1991) (quotation omitted)); *cf. Diomampo*, 124 Nev. at 427, 185 at 1039-40 ("[A] 'mere passing reference' to post-*Miranda* silence 'without more, does not mandate an automatic reversal.'") (quoting *Shepp v. State*, 87 Nev. 179, 181, 484 P.2d 563, 564 (1971), *overruled on other grounds by Stowe v. State*, 109 Nev. 743, 746, 857 P.2d 15, 17 (1993)).

### G. *Sufficiency of the evidence*

Flowers argues that the State did not offer sufficient evidence to convict him. Substantial evidence is "defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see Vega*, 126 Nev. at 342, 236 P.3d at 639 (reviewing evidence "in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have found [proof of the crime] beyond a reasonable doubt") (quotations omitted).

Ample evidence supports the jury's verdict. The State provided DNA evidence. The State also established that Flowers knew Sheila through his prior relationship with Debra. The State bolstered this direct evidence by proving that Flowers committed a similar sexual assault and murder, confirming identity. This evidence was more than sufficient to establish Flowers' guilt.

### H. *Cumulative error*

Flowers argues that the cumulative effect of errors in this case deprived him of his constitutional right to due process and a fair trial. *See*

*Chambers*, 410 U.S. at 290 n.3 (accumulated error may rise to a constitutional violation). But here there was only one error: not allowing Flowers to introduce as evidence that he told Sherwood he might answer more questions after talking to his attorney. That error was harmless, and there is no other error to cumulate, so Flowers' cumulative error objection fails.

### III. *NEW TRIAL ISSUES*

About a year and a half after trial, Flowers moved for a new trial on the basis of newly available evidence: Brass's subsequent conviction for murder and robbery. Flowers argued that he could have used that conviction to impeach Brass's testimony. The State argued that the defense knew of Brass's pending charges before trial and could have moved for a continuance, but did not. The State also argued that Brass's testimony was not critical to the State's otherwise strong case against Flowers. The district court denied the motion.

"The court may grant a new trial to a defendant . . . on the ground of newly discovered evidence." NRS 176.515(1). This court reviews the grant or denial of a motion for a new trial under an abuse of discretion standard. *Funches v. State*, 113 Nev. 916, 923, 944 P.2d 775, 779 (1997).

The district court did not abuse its discretion in denying the motion. Flowers knew about Brass's pending charges at the time of his trial. While Brass's later conviction could have been used to impeach Brass, the circumstances of his murder conviction did not involve sexual assault or murder of a woman, so the details beyond the fact of the conviction would not have been admissible. That Brass was convicted of murder thus did not

dilute the impact of the sole-source DNA tying Flowers to Coote's murder or implicate Brass in Sheila's murder beyond what the DNA mix from Flowers and Brass already showed. The evidence thus did not qualify as newly discovered or establish a basis for granting Flowers a new trial.

For these reasons, we affirm.

_____, C.J.
Pickering

We concur:

_____, J.
Parraguirre

_____, J.
Cadish